IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 21, 2022

## BRIAN PHILIP MANOOKIAN v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Davidson County**
No. 20-0833-I          William B. Acree, Senior Judge

_____

**No. M2022-00075-SC-R3-BP**

In this lawyer disciplinary case, the lawyer's conduct compels disbarment. The lawyer sent a series of intimidating, demeaning, embarrassing, and harassing communications to opposing counsel and others. Some targeted family members of opposing counsel, including one family member who was also a former client, and caused well-founded concern for their well-being and safety. In the ensuing disciplinary proceedings, a Board of Professional Responsibility hearing panel found that the purpose of the communications was to intimidate opposing counsel in order to gain unfair advantage in pending litigation. It concluded *inter alia* that the lawyer's conduct was prejudicial to the administration of justice, that he failed to respect the rights of third persons, and that he violated his duty to a former client, in violation of Tennessee's Rules of Professional Conduct. The hearing panel said the presumptive sanction was disbarment, found four aggravating factors, and found no mitigating circumstances. Without explanation, the hearing panel recommended a two-year suspension instead of disbarment. The attorney appealed to the trial court. The trial court indicated that, had the Board of Professional Responsibility filed a separate petition for review, the trial court would have recommended disbarment, but because the Board did not, the trial court affirmed the sanction of suspension. Both parties appeal. Here, the lawyer's conduct was egregious. Victimizing the families of opposing counsel and causing concern for their well-being and safety is an especially grave offense and a profound dishonor as a lawyer. The hearing panel's decision to deviate downward from the presumptive sanction of disbarment was arbitrary and capricious, and the lawyer must be disbarred. Accordingly, we modify the judgment of the hearing panel and impose the sanction of disbarment.

**Tenn. Sup. Ct. R. 9, § 33.1(d); Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Decision of the Hearing Panel Affirmed in Part, Reversed in Part**

HOLLY KIRBY, C.J., delivered the opinion of the court, in which JEFFREY S. BIVINS, ROGER A. PAGE, and SARAH K. CAMPBELL, JJ., joined. SHARON G. LEE, J., filed a dissenting opinion.

James W. Milam, Nashville, Tennessee, for the appellant, Board of Professional Responsibility of the Supreme Court of Tennessee.

Brian Manookian, Nashville, Tennessee, Pro Se.

## OPINION

The attorney in this case, Appellee Brian Philip Manookian, and the Tennessee Board of Professional Responsibility ("Board" or "BPR"), both appeal discipline imposed by the BPR hearing panel for communications by Mr. Manookian to opposing counsel in Mr. Manookian's representation of a client in pending civil litigation. The summary of facts and circumstances is based primarily on exhibits and testimony in the proceedings before the hearing panel.

### FACTUAL AND PROCEDURAL BACKGROUND

Mr. Manookian was licensed as a lawyer in Tennessee in 2007. That same year, he was hired as an associate in the law firm of attorney C.J. Gideon.[1] The firm principally represented health care providers in malpractice litigation. During Mr. Manookian's employment, he spent time with Mr. Gideon's family. They developed somewhat of a friendship.

The relationship deteriorated in 2011 when Mr. Gideon received reports of Mr. Manookian's poor work performance. Mr. Gideon eventually told Mr. Manookian he would be fired if his performance did not improve. Soon after, Mr. Gideon asked Mr. Manookian about whether discovery requests had been issued in a case, and Mr. Manookian provided a false response. Mr. Gideon then terminated Mr. Manookian's employment.

After that, Mr. Manookian and Mr. Gideon had little contact with one another. Mr. Manookian later began practicing with Brian Cummings at Cummings Manookian PLC.

---

[1] Mr. Gideon was licensed in 1978.

## *Shao* Case

Pertinent to this matter, in 2017, Mr. Manookian, along with co-counsel Mr. Cummings, represented plaintiff Steven Shao in a healthcare liability action against HCA Health Services of Tennessee, Inc., d/b/a Summit Medical Center; Toby Smith, M.D.; and Middle Tennessee Pulmonary Associates, PLLC ("*Shao* case"). Attorneys from a Nashville firm represented HCA Health Services of Tennessee, Inc. ("HCA"), and attorney Michael Geracioti of Levine, Orr & Geracioti, PLLC represented Toby Smith, M.D. and Middle Tennessee Pulmonary Associates, PLLC respectively. The *Shao* lawsuit was filed in the Davidson County Circuit Court and assigned to Judge Thomas Brothers. The parties engaged in pretrial discussions and agreed on deadlines for discovery and for a case management conference. Discovery requests were exchanged.

Unexpectedly, in March 2017, Mr. Geracioti died one morning at his home. That day, Mr. Geracioti's office told Mr. Manookian and Mr. Cummings of Mr. Geracioti's death.

The day Mr. Geracioti died, after receiving notice of his death, Mr. Manookian and Mr. Cummings filed a motion for default judgment against Mr. Geracioti's clients. Four days later, Mr. Manookian sent a letter to Mr. Geracioti's associate, threatening to assert an $8,000,000 claim against her clients, her law firm, and Mr. Geracioti's estate.[2]

Soon after, attorneys Phillip North[3] and Eric Miles were substituted in as counsel for Mr. Geracioti's clients in *Shao*. They filed a response asking Judge Brothers to deny the motion for default judgment.

On April 24, 2017, after a hearing, Judge Brothers denied the motion. In doing so, *sua sponte*, Judge Brothers reprimanded Mr. Manookian and Mr. Cummings for their conduct in the immediate aftermath of Mr. Geracioti's death:

> This Court is profoundly disappointed in the conduct of plaintiff's counsel and the timing and manner in which the Motion for Default was presented. Being a zealous advocate does not mean that one abandons all sense of professionalism, courtesy and common decency. It is clear that counsel for plaintiff was attempting to gain a tactical advantage by aggressively pursuing the claim for default on the very day of Mr. Geracioti's death; despite the fact that all parties had been actively engaged in pretrial

---

[2] *See Shao ex rel. Shao v. HCA Health Servs. of Tenn., Inc.*, No. M2018-02040-COA-R3-CV, 2019 WL 4418363, at *1 (Tenn. Ct. App. Sept. 16, 2019). These facts are included for context.

[3] Mr. North, licensed in 1975, regularly defended medical malpractice cases.

proceedings and plaintiff's counsel never complained after striking the original motion [for default judgment]. . . .

It is with regret that this Court must reprimand all of plaintiff's counsel for conduct that is unbecoming members of the Bar and officers of the court. Hopefully counsel will apply this constructively and thereby avoid such reprehensible behavior in the future.

### Gideon Conduct

In mid-July 2017, the lawyers representing HCA in *Shao* withdrew. In their stead, Mr. Manookian's former employer C. J. Gideon was substituted as counsel, along with another lawyer in Mr. Gideon's law firm. Mr. Gideon began evaluating the plaintiff's outstanding discovery responses. On August 17, 2017, Mr. Gideon sent a letter to Mr. Manookian and the other lawyers in the *Shao* case detailing "continuing deficiencies in the plaintiff's response" to discovery requests propounded on Mr. Manookian's client and asking plaintiff's counsel to supplement them.

Two days later, on Saturday August 19 at 9:29 p.m., Mr. Manookian sent an email from his law firm email address to Mr. Gideon at his law firm email address:

Clarence –

I hear [name of Mr. Gideon's daughter] is working at [name of daughter's employer]. What a fantastic opportunity; particularly given her history of academic failure and alcohol and substance abuse.

I happen to have some very close friends at [name of daughter's employer].

I will make it a point to see what I can do regarding her prospects there.

I am reminded that it is good for us to keep apprised of each other's lives and the things we can do to influence them.

At the end, the email included a preprinted signature block for Mr. Manookian and his law firm.

Mr. Manookian's email, Mr. Gideon later explained, brought him back to the worst time in his and his wife's life. On her eighteenth birthday during her high school senior year, Mr. Gideon's daughter drank some wine before going to school and was suspended for it. This incident occurred while Mr. Manookian was employed by Mr. Gideon's firm.

- 4 -

It resulted in Mr. Gideon's daughter leaving high school to attend a six-week camp in the mountains. Mr. Gideon later said he had not spoken to Mr. Manookian about this.

Mr. Gideon characterized the description in Mr. Manookian's email of Mr. Gideon's daughter having a history of academic failure as "[a]bsolutely a lie." He did not dispute the incident with alcohol but said his daughter had a 4.0 GPA when she left that high school and enrolled in another school, and that she ultimately graduated from college.

Mr. Gideon said Mr. Manookian's email made him sick to his stomach and angry that "anybody would be so low to attack an opponent through their kids." He said it provoked "unbelievable anxiety over what [Mr. Manookian] was going to do to my daughter" and a helpless feeling that "I wouldn't be able to do anything about it." Mr. Gideon saw the intent of the email as a "brushback pitch to get me to back off" in the *Shao* litigation, to send the message: "Don't be so vigorous in defending these people against their claims."

The following Monday, Mr. Gideon filed a complaint with the BPR against Mr. Manookian for the August 19 email about his daughter. The same week, Mr. Gideon filed a motion in *Shao* for sanctions against Mr. Manookian. He attached the offending email to his motion, but to protect his daughter's privacy, he redacted identifying information about her and about her employer.

Mr. Manookian's response filed with the trial court claimed innocuous intentions. He said the company that employed Mr. Gideon's daughter was one of Mr. Manookian's clients and included some of his close friends. He explained that he spoke with the daughter's employer and then "emailed Clarence Gideon on August 19, 2017 regarding [the daughter's] position at [employer] stating, 'I will make it a point to see what I can do regarding her prospects there.'"

Inconsonant with Mr. Manookian's claimed good intentions, however, his response to the motion for sanctions included the identifying information Mr. Gideon had redacted, such as the name of Mr. Gideon's daughter and the name of her employer, and it attached an unredacted copy of the offending email. And for good measure, an exhibit to Mr. Manookian's filed response also included the same email, unredacted, for a second time.[4]

---

[4] With little explanation, Mr. Manookian's response also attached law firm emails Mr. Gideon had sent years earlier, while Mr. Manookian was still employed with the firm, that included unflattering remarks about other lawyers. Mr. Manookian added that he had kept more such emails and would be "happy to file" them.

Going still further, Mr. Manookian inserted into his filed response a footnote ["Footnote 1"] that contained information about Mr. Gideon's son, whom Mr. Manookian had represented on a sensitive sexual matter while he was employed by Mr. Gideon's firm:

> Mr. Manookian's prior experience with Mr. Gideon's adult children is limited to having successfully represented his adult son in a matter involving Mr. Gideon's adult son exchanging sexually graphic emails with a much older man for the sexual gratification of the older man.

The footnote included detail such as the heading of the case naming Mr. Gideon's son, the court in which it was filed, the docket number, and the pleading with specific page references where the referenced sexual information could be found. Mr. Manookian's filed response did not explain how the information in Footnote 1 related to the subject matter of Mr. Gideon's motion for sanctions.

Mr. Gideon later explained that, in 2008 or 2009, while Mr. Gideon's son was in college, the son was contacted over the internet by someone who claimed to be a woman and sent the son photographs of a beautiful woman represented to be the sender. Mr. Gideon's son thought it was odd and "too good to be true" and showed his father the photographs. Mr. Gideon said he did not know the term "catfishing" at the time,[5] but he sensed something amiss. At the time, Mr. Manookian was still employed by Mr. Gideon's firm, and he had often described himself as very knowledgeable about the internet. Mr. Gideon solicited Mr. Manookian's help for his son.

After investigating, Mr. Manookian determined the sender was a man, not the beautiful woman depicted in the photos. Mr. Manookian located the man, sued him on behalf on Mr. Gideon's son, and the matter was concluded by the defendant paying a financial settlement. Though the lawsuit was not sealed, Mr. Gideon said it never made any headlines, few people knew about it, and it "certainly wasn't in the public domain." He said neither he nor his son heard another word about the matter until Mr. Manookian inserted it into the *Shao* litigation.

---

[5] As one author explains:

> Popularly known as "catfishing," the deceptive practice begins when a con artist, fraudster, or prankster creates one or dozens of fake profiles online with stolen pictures and manufactured personas in order to attract the attention of unsuspecting users. The photos are almost always of a very attractive male or female, and the profiles depict a fun-loving, if sometimes introspective and sensitive individual. With this bait set, the scammer trolls the Internet for an unsuspecting catch.

Brent Dean, *The Anatomy of a Catfish*, *in Head to Head*, 15 Quinlan, Comput. Crime and Tech. in L. Enf't NL 3, no. 9, Sept. 2019.

Mr. Gideon pointed out that his son had nothing to do with the *Shao* case, his daughter's employment, or the subject matter of the motion for sanctions against Mr. Manookian. Mr. Gideon said Mr. Manookian's description of the son's lawsuit was "written to make it look like my son was knowingly communicating with a guy for their joint mutual sexual satisfaction. That's not right. That's not accurate." He viewed Mr. Manookian's act of inserting the son's lawsuit into his response as done "to take a shot at me and to embarrass a former client and in that sense get back at me yet again."

Judge Brothers held a hearing on September 21, 2017 on Mr. Gideon's motion for sanctions. At the hearing, Mr. Manookian explained that his email to Mr. Gideon about Mr. Gideon's daughter was intended to convey only that Mr. Manookian intended to help Mr. Gideon's daughter. Mr. Manookian claimed that he had not yet received Mr. Gideon's letter on the deficiencies in the *Shao* plaintiff's discovery responses, sent on August 17, when he sent the August 19 email to Mr. Gideon.[6]

Judge Brothers declined to credit Mr. Manookian's explanation. Instead, Judge Brothers viewed the email as a "thinly veiled threat." He likened Mr. Manookian's email to a scene "in a gangster movie" where a "mobster" says "just want to let you know, I know where you live, I know where your children go to school . . . and I know what kind of car you drive" and adds "y'all have a great day" before he walks away.[7]

On September 28, 2017, Judge Brothers entered an order granting Mr. Gideon's motion for sanctions. Judge Brothers found that, although Mr. Manookian's email to Mr. Gideon did not specifically reference the *Shao* case, Mr. Manookian knew when he sent it that "Mr. Gideon was opposing counsel in this case" and "it was a communication between opposing counsel in a case pending before this Court." The order rejected Mr. Manookian's claim of laudable intent and characterized his email as a "threat" against Mr. Gideon's daughter made to gain tactical advantage over opposing counsel in the pending *Shao* litigation.[8]

---

[6] Mr. Manookian's response to the motion for sanctions included, as an attachment, an email that appears to be from an employee at Mr. Manookian's firm, indicating Mr. Gideon's letter was received in the mail at the office on "8/21/17." The employee did not give an affidavit or testify.

[7] Apparently, later on the same day as the hearing, Mr. Manookian filed a motion for Judge Brothers to disclose/comply with the Tennessee Code of Judicial Conduct, to initiate his effort to disqualify Judge Brothers from the *Shao* case or get him to recuse himself.

[8] Judge Brothers's order said:

> While Mr. Manookian claims otherwise, the Court finds the subject email can only be construed as a threat against the livelihood of Mr. Gideon's child. This Court is

- 7 -

The order noted that the trial court's previous order, admonishing Mr. Manookian for filing a motion for default the day Mr. Geracioti died and then threatening to sue the Geracioti estate, was not sufficiently specific to hold that Mr. Manookian's conduct toward Mr. Gideon was contempt of court. To remedy this, the order included an express prohibition:

> The Court hereby expressly forbids Mr. Manookian from making any communication to counsel in this case that threatens, insults, disparages, demeans, or embarrasses them and/or their family members. . . .

> Any violation of this Court's orders by Mr. Manookian shall be heavily scrutinized and all possible sanctions, both civil and criminal, will be considered.

Describing Mr. Manookian's conduct as "repellent and shameful," the order said that the trial court was obligated to report it to the BPR. In addition, the order found that Mr. Manookian's conduct toward Mr. Gideon, and especially as to Mr. Gideon's children, was "unconscionable" and justified an award of sanctions.[9] Judge Brothers awarded Mr. Gideon $5,550 in attorney fees against Mr. Manookian.

---

unpersuaded by Mr. Manookian's purported explanation that the email was somehow meant to express his desire to assist Mr. Gideon's child with employment. At a minimum this communication was a thinly veiled threat to embarrass Mr. Gideon, his child, and his family. It can also be viewed as a blatant act of attempted intimidation meant to secure some tactical advantage over opposing counsel.

The email's reference to alleged previous personal issues of Mr. Gideon's child and Mr. Manookian's alleged influence with his friends at the child's employer combined with the conclusion that ". . . it is good for us to keep apprised of each other's lives and the things we can do to influence them" clearly carries a threatening tone. Mr. Manookian has produced an affidavit from an employee at the child's employer who states that she inquired about Mr. Gideon's child on August 18, 2017. However, this inquiry does not explain or absolve the threat[en]ing email Mr. Manookian sent. Threatening another attorney's child under any circumstance is unprofessional, unethical, and appalling.

[9] The order stated:

This Court finds that there was no reason for Mr. Manookian to identify Mr. Gideon's children in his Response and his goal in doing so was to embarrass, annoy and oppress Mr. Gideon. Since such conduct occurred before this Court in formal filings, it is sanctionable.

Revealing the name of Mr. Gideon's child and employer in the response filed in this matter is unconscionable. There is simply no reason to have done so other than an

- 8 -

**North Conduct**

Meanwhile, Mr. North, successor counsel for the Geracioti clients in *Shao*, watched Mr. Manookian's 2017 conduct toward Mr. Gideon with apprehension. He recognized that the August 19, 2017 email to Mr. Gideon showed Mr. Manookian's willingness "to go after somebody's family." If Mr. Manookian was "willing to publicly humiliate Mr. Gideon's daughter in order to try to gain a tactical advantage in [the *Shao*] case," Mr. North thought, "he would do it against me."

By the spring of 2018, Mr. North's firm had taken over a number of Mr. Geracioti's cases, including *Shao* in Judge Brothers's court and three others, with Mr. Manookian's firm. Mr. North was directly supervising the cases with Mr. Manookian's firm. He felt trial preparation was going well; all four were "headed for a disaster for Mr. Manookian," and Mr. North expected defense verdicts in them all. Mr. North felt that *Shao* in particular "was falling apart" for Mr. Manookian. *Shao* was set for trial in November 2018; if Mr. Manookian succeeded in getting Judge Brothers off *Shao*, this would delay the trial date by at least a year. For this reason, Mr. North made it clear that he was "resistant" to Mr. Manookian's efforts in *Shao* to replace Judge Brothers with another trial judge.

At a case management conference in *Shao*, in support of his effort to disqualify Judge Brothers or get him to recuse himself, Mr. Manookian said he intended to show that Judge Brothers showed bias against Mr. Manookian by presenting testimony from Judge Hamilton Gayden to that effect. At the conference, to ascertain what Judge Gayden's testimony would be, Mr. North asked if anyone objected to his calling Judge Gayden to ask him what he would say about Judge Brothers.

Following the case management conference, after business hours on Friday March 30, 2018, Good Friday before the Easter weekend, Mr. Manookian sent an e-mail to Mr. North:

Counsel,

---

attempt to publish this information to the general public and thereby expose the child and Mr. Gideon's family to possible embarrassment.

Equally egregious is the identification of and unflattering reference to Mr. Gideon's other child in a footnote to the publicly filed response. Likewise there is no fathomable purpose in attaching derogatory comments, made almost seven years ago by Mr. Gideon, about another lawyer.

I am emailing to provide written notice that Plaintiff intends to pursue sworn testimony regarding *ex parte* statements made by [Judge] Thomas White Brothers about this case, during the pendency of this case—including evidence of Thomas White Brothers' existing and articulated biases affecting this case—via affidavit from the Honorable Hamilton Gayden, Jr.

In addition, [i]n response to Phillip North's specific inquiries regarding Judge Gayden, which Mr. North voiced at the most recent Case Management Conference in this matter; Plaintiff **does not oppose**:

1. Judge Gayden disclosing his actual experience, and resulting opinion, of Phillip North's reputation for truthfulness, honesty, and fidelity; and/or,

2. Judge Gayden disclosing his actual experience, and resulting opinion, on Phillip North's propensity for dishonesty, exaggeration, and falsehood.

I hope you all have a wonderful and relaxing Easter weekend.

Mr. Manookian's email copied all other counsel in *Shao* and others not involved in the case.[10]

Mr. North said he was "floored by" Mr. Manookian's email because it conveyed the impression that Judge Gayden had "actual experience and a resulting opinion" that Mr. North had a "propensity for dishonesty, exaggeration, and falsehood." Mr. North said the insinuation was false; he and Judge Gayden had been colleagues their whole career; Judge Gayden supported Mr. North's unsuccessful run for public office and even attended Mr. North's wedding. Mr. North emphasized that, over the course of his forty-five-year legal career, he had diligently maintained the highest degree of integrity and honesty with the courts.[11]

Mr. North felt Mr. Manookian's email "had no useful purpose" as Mr. North's "integrity was not at issue" in *Shao*. He said his firm had been going "full steam ahead"

---

[10] This included Eric Miles, Mr. North's partner; Afsoon Hagh, Mr. Manookian's wife and co-counsel for Plaintiff Shao; C.J. Gideon, Blake Carter, and Lee Nutini, co-counsel for HCA; Mark Hammervold, co-counsel for Plaintiff Shao; and Linda DeBaun, Mr. Gideon's paralegal; as well as Marsh Nichols, the trial court's special master.

[11] Mr. North found particularly disturbing Mr. Manookian's choice to include a closing "have a wonderful and relaxing Easter weekend" at the end of a disparaging email sent to his colleagues. He likened it to the "gangster" comparison Judge Brothers made in the hearing on Mr. Gideon's motion for sanctions against Mr. Manookian.

on the four cases against Mr. Manookian's firm and described Mr. Manookian's email as "a gratuitous attempt to embarrass me and distract me from my mission, which was, I was going to get these four cases tried." Mr. North believed the email violated Judge Brothers's past order expressly forbidding Mr. Manookian from "making any communication to counsel in this case that threatens, insults, disparages, demeans, or embarrasses them."

Mr. North filed a motion asking the trial court to place Mr. Manookian's March 30 email under seal because he intended to move for sanctions for violating the prior order and did not want to republish the email. The motion to seal was rendered moot, however, when Mr. Manookian filed a separate lawsuit for declaratory judgment against Mr. North and put the offensive email in the body of the publicly-filed complaint for declaratory judgment.[12] With his motion to seal mooted, Mr. North withdrew it.

This turn of events prompted another disparaging email from Mr. Manookian:

Phillip,

I've had a chance to review your most recent non-substantive motion. I applaud you on finally filing something other than a "me-too, piggy-back" motion on Gideon Cooper's effort; if not your actual scholarship. Putting pen to paper is a great first step, Phillip! If you keep at it, you never know what you might achieve!

With that said, are you really arguing that you need pleadings unsealed because you claim to not have **access** to materials (1) that are not only publicly available by definition, but (2) were also previously served on you, and (3) are therefore in your actual possession?

If so, I'm happy to provide you with the documents you claim to need. Just let me know and I'll send them over. If [sic] think otherwise you risk the in-person embarrassment we all tried to downplay last Friday in court when you withdrew your last non-substantive motion on this topic while staring at your feet.

This email, sent on June 7, 2018, went to Mr. North's paralegal, Kim Woods, with copies to ten other attorneys and law office staff. It was sent from Mr. Manookian's law firm email address with *Shao* in the subject line.

---

[12] Mr. North testified that Mr. Manookian's separate declaratory judgment action, placing the Good Friday email in the body of the complaint, had no purpose except to make the offensive language public and distract Mr. North from preparing *Shao* for trial.

In response to Mr. Manookian's March 30, 2018 and June 7, 2018 e-mails, Mr. North moved for a third round of sanctions against Mr. Manookian. The motion recited Mr. Manookian's pattern of misconduct and asked the trial court to consider not only monetary sanctions but to also disqualify Mr. Manookian from *Shao* or even suspend or revoke his privilege to practice in the Davidson County Circuit Courts. In support, the motion noted Mr. Manookian's past practice of filing motions for recusal, often based on accusations of bias or misconduct, against judges who imposed consequences on him for misconduct.[13]

Mr. North filed his motion for a third round of sanctions on June 15, 2018, with a certificate of service indicating it was served on Mr. Manookian and other counsel on the same date.[14] The motion resulted in another disparaging email from Mr. Manookian to Mr. North, sent on June 22, 2018, accusing Mr. North of placing a false certification of service

---

[13] In support of the argument that sanctions more severe than monetary fines were needed, the motion recited instances in which various judges had made findings of misconduct by Mr. Manookian, with no abatement of the misconduct. The motion recited eight instances in unrelated matters: (1) a 2015 criminal guilty plea to mail fraud by Mr. Manookian, accepted by Judge Todd Campbell; (2) injunctive relief ordered by Chancellor Russell Perkins against Mr. Manookian for threatening and demeaning conduct; (3) continuation of the same injunction after the case was transferred to Chancellor Claudia Bonnyman with a finding that Mr. Manookian had engaged in conduct that endangered the public; (4) imposition of sanctions against Mr. Manookian by a federal magistrate judge in the eastern district of Texas based on a finding that he engaged in fraud and an abuse of the judicial process; (5) affirmation of the magistrate's findings and sanctions by the federal district judge in the eastern district of Texas; (6) findings by Judge Phil Smith in Mr. Manookian's divorce proceedings of physical and emotional abuse; (7) revocation by a state court in Texas of Mr. Manookian's permission to practice in that court pro hac vice, after review and a hearing on the findings by the Texas federal district court; and (8) findings by Judge Michael Binkley that Mr. Manookian made false statements and was in contempt by violating the court's protective order. The motion also recited Judge Brothers's prior findings about Mr. Manookian in *Shao* before the case was re-assigned.

Mr. North's motion for a third round of sanctions also recited motions for recusal based on accusations of bias or misconduct filed by Mr. Manookian or his counsel against Chancellor Russell Perkins, Judge Michael Binkley, and Judge Brothers, all judges who had imposed consequences on Mr. Manookian for his misconduct.

[14] By the time Mr. North filed his motion for a third round of sanctions, Judge Brothers had voluntarily stepped off the *Shao* case and asked that it be reassigned to a different trial judge. Senior Judge Don Ash was designated to hear the case. *Shao*, 2019 WL 4418363, at *2 n.5.

of the motion for sanctions.  Mr. North maintained that the accusation in the June 22 email was false.[15]

On July 20, 2018, Mr. North moved for a fourth round of sanctions, this one based on Mr. Manookian's June 22 email.  Mr. North viewed that email as also intended to get him to "back off" on pressuring Mr. Manookian on the cases in which they were opposing counsel.

Despite these disputes, discovery in *Shao* continued apace.  Mr. Gideon and Mr. North deposed Mr. Manookian's academic expert in *Shao*, named Zgoda.  Mr. North later described the deposition as "an absolute disaster for the *Shao* plaintiff."  Mr. North said the "expert admitted he hadn't been given the right information about the patient so that the whole premise of the lawsuit was erroneous" and the expert added, "I'm surprised this is even being pursued."

Shortly after this deposition, Mr. Manookian sent out another controversial Friday evening email.  On Friday, August 3, 2018, at 8:03 p.m., Mr. Manookian sent an email with a letter to "Counsel" in *Shao* with the subject line: "*Shao v. Smith, et al. (North Non-Substantive Motions)*."  The letter said that Mr. Manookian was "disclosing" two things "in response to" Mr. North's recent filings.  First, the letter "disclosed" an email from an attorney in Mr. North's office referencing the flap over service of the motion for a third round of sanctions and saying she could not "explain" the alleged postmark discrepancy.

Second, even though Judge Brothers had been off the *Shao* case since April, Mr. Manookian's August 3, 2018 letter "disclosed" an "Unsolicited Voicemail" from Mr. North's brother, Retired Davidson County Circuit Court Judge Steve North, "volunteering 'information that might be of some help to [Mr. Manookian] . . . with regard to [Mr. Manookian's] controversy with Judge Brothers' in the *Shao* Matter."

The letter included a long footnote purporting to be a summary of Mr. Manookian's subsequent telephone conversation with retired Judge North:

> Preliminary to lengthier phone call conducted at the gratuitous request of Retired Davidson County Circuit Court Judge Steve North, wherein Ret. Judge North states and opines upon personal knowledge, having served on the bench with Judge Tom Brothers and being the brother of Phillip North, that: Judge Tom Brothers is "corrupt" and has been for some time, that Judge

---

[15] Mr. North maintained that Mr. Manookian used a postmarked envelope for another item his office mailed to Mr. Manookian, to make it look as though Mr. North had falsified the certificate for service on the motion for sanctions.

Tom Brothers' "corruption" arises out of his financial needs; that Judge Tom Brothers' "corruption" has long resulted, and continues to result, in preferable, "corrupt" treatment for certain Nashville-based companies, which benefit from consistent, "corrupt" favorable rulings in Judge Brothers' courtroom, to the exclusion of justice; that such "corruption" has, and continues to, materially benefit, among others, C.J. Gideon and his firm, in his representation of certain "corrupt" clients[,] as well as lengthy disclosure and dissertation on Phillip North, all of which is material to the supposed grievances in Phillip North's "Motion for Third Round of Sanctions."

The emailed letter was sent not only to Mr. North, but also to eighteen other individuals, including several attorneys at Mr. North's firm, three attorneys and a paralegal at Mr. Gideon's firm, other attorneys at Mr. Manookian's firm, and two other Nashville attorneys. Some of these individuals were not involved in *Shao*.

About twenty minutes after Mr. Manookian emailed this Friday evening letter, he emailed Mr. North individually, but copied to all the same recipients as the email sent minutes earlier, with the same subject line referencing *Shao*:

Phillip,

I had previously never had the pleasure of encountering your brother, the Honorable Davidson Circuit Court Judge Steve North (Ret.), prior to his voluntarily reaching out to me about the irregularities in this case. Can you please listen to his voicemail (previously provided to you) and verify, as his brother, his voice.

The email had an attachment, but Mr. North did not open it. Mr. North viewed the email as an attempt to create friction between his brother and him, so he did not respond to it.

Apparently unsatisfied at having received no response to these two emails, Mr. Manookian sent Mr. North a more personal message. The next day, Saturday August 4, 2018, he sent another email to Mr. North individually, also referencing *Shao* in the subject line:

Phillip,

I see that my email and attachments are being repeatedly opened at the IP address associated with the consumer Comcast cable account for [Mr. North's home address].

- 14 -

That address is the residential property where you have consistently lived with your parents (other than for a brief period of time from 1984–1986 where you rented unit 602 at the Capitol Towers on Gay Street) until the North Family Trust essentially gifted you the property for $10.00. Upon investigation, this gifted piece of property in North Nashville, given to you for $10 by your parents, represents the sole piece of real property you own at 68 years of age.

Further confirming that you have read my email, records additionally reflect that [name of Mr. North's wife] — the woman for whom you left your wife and two minor daughters ([names of Mr. North's daughters]) — has registered a [wife's vehicle description] (VIN: [number for wife's vehicle], TN License Plate [number for wife's vehicle]) at the same address your parents gave you and where my email is being viewed.

Please simply reply and confirm your brother Steve North's voice.

This Saturday missive was emailed to the same list of attorneys and others as the previous Friday evening emails.

Unsurprisingly, Mr. North was upset by it. He viewed it as intended to insult him, embarrass him and his family, cast him in a false light, and pit him against his brother. But most of all, Mr. North viewed it as a threat. He likened it to Judge Brothers's "gangster" admonition at the hearing on Mr. Gideon's motion for sanctions against Mr. Manookian: "I know where you live. I can reach you. I can get you. I can touch you. I can hurt your family."

Mr. North said the Saturday, August 4 email was particularly disruptive to his life and law practice. It caused him concern for his personal security, the safety of his wife in their home, and the security of his office.[16] Most of all, Mr. North said, Mr. Manookian's message caused him to "constantly be looking over [his] shoulder." He worried about unusual sounds and thought, "What is this guy trying to do? . . . [I]s he some kind of psycho? . . . [I]s he going to come in here and firebomb the house? Break in my office and shoot it up? You just don't know."

---

[16] Mr. North was concerned that Mr. Manookian had hacked into his home and work computers. Apprehensive about his wife's safety at home by herself, Mr. North had his family's home security system reviewed and updated, and he alerted neighboring family members. He took Mr. Manookian's photo to the security guard at his building and told him to call him so he could call police if Mr. Manookian showed up. Mr. North increased the frequency of his handgun training. He noted the make, model, and color of Mr. Manookian's car and looked for it every time he approached the entrance to his property.

On August 10, 2018, Mr. North filed a motion for a fifth round of sanctions against Mr. Manookian for the August 3 and 4 emails.[17]  It asked the trial court to hold Mr. Manookian in contempt for violating Judge Brothers's order and either disqualify Mr. Manookian from *Shao* or suspend him from practicing in the Davidson County Circuit Courts.

### *Shao* Sanctions Hearings

On September 19, 2018, Judge Don Ash held a hearing on Mr. North's motions for the third and fourth round of sanctions against Mr. Manookian.  These motions concerned the March 30, June 7, and June 22, 2018 series of emails.

The next day, Judge Ash entered an order granting the motions for sanctions, recalling Judge Brothers's past orders admonishing and sanctioning Mr. Manookian.[18]  As to Mr. Manookian's March 30 email, Judge Ash found no dispute but that Judge Gayden's supposed experience and opinions about Mr. North were "never discussed at the [case management] meeting in mid-March," and Mr. Manookian's statements to that effect insulted, disparaged, demeaned or embarrassed Mr. North.  The order noted that, at the hearing, "Mr. Manookian could give no legitimate reason" for making the statements in the email.  It said that, at the hearing, Mr. Manookian admitted he sent the June 22 email "because he was angry" about materials Mr. North attached to the motion for a third round of sanctions.

Judge Ash found that Mr. Manookian repeatedly ignored the clear directives of the court and conducted himself in a reckless manner.[19]  Judge Ash ordered Mr. Manookian to

---

[17] The motion referenced and incorporated the list and exhibits for the motion for a third round of sanctions, detailing multiple prior instances in which trial judges had made findings of misconduct by Mr. Manookian and imposed sanctions.

[18] Judge Ash's order first quoted from Judge Brothers's April 24, 2017 order, which expressed "profound disappointment" in the conduct of Mr. Manookian and Mr. Cummings in the wake of Mr. Geracioti's death, reprimanded them, and admonished them to "avoid such reprehensible behavior in the future."  Judge Ash then reviewed Judge Brothers's September 28, 2017 order, in which he condemned Mr. Manookian's conduct toward Mr. Gideon, imposed monetary sanctions, and forbade Mr. Manookian from "making any communication to counsel in this case that threatens, insults, disparages, demeans, or embarrasses them and/or their family members."  Judge Ash quoted the passage in Judge Brothers's order in which he expressed hope that Mr. Manookian would "learn" from the trial court's admonition and "in the future . . . conduct himself in a manner that is worth[y] of his profession."

[19] Judge Ash's order observed: "Sadly, Mr. Manookian has traveled down a path where he has chosen to continue verbal attacks on opposing counsel rather than to follow a judge's explicit orders.  He has been reprimanded by a court, instructed to stop this unprofessional behavior, and forced to pay attorney

pay Mr. North $37,164 in attorney fees, in addition to the $5,880 in attorney fees Judge Brothers awarded to Mr. Gideon. Judge Ash also suspended Mr. Manookian from practicing law in the Davidson County Circuit Courts for sixty days.[20]

On September 28, 2018, the trial court in *Shao* entered an agreed order of voluntary dismissal with prejudice of the plaintiff's claims against two of the defendants. *Shao ex rel. Shao v. HCA Health Servs. of Tenn., Inc.*, No. M2018-02040-COA-R3-CV, 2019 WL 4418363, at *3 (Tenn. Ct. App. Sept. 16, 2019).

On October 15, 2018, Judge Ash held a hearing on Mr. North's motion for a fifth round of sanctions against Mr. Manookian, regarding the August 3 and 4 series of emails to Mr. North. Neither Mr. Manookian nor Mr. Cummings appeared.

On October 22, 2018, the trial court granted the motion for sanctions. The order found that, "[a]s evidenced by the August 3 and 4 emails, Mr. Manookian continues to conduct himself in a reckless manner in utter disregard of the Court's directives." The trial court awarded Mr. North $11,874 in attorney fees and awarded Mr. Gideon and his firm $1,175 in attorney fees. It again suspended Mr. Manookian from practicing law in the Davidson County Circuit Courts for 180 days, to run consecutively to the previous sixty-day suspension.

On November 1, 2018, the trial court entered another agreed order of voluntary dismissal with prejudice in *Shao*, this one as to the plaintiff's claims against a third defendant. *Shao*, 2019 WL 4418363, at *3. The plaintiff in *Shao* did not appeal, but Mr. Manookian filed his own appeal of the orders imposing sanctions on him. *Id.*

### *Shao* Appeal of Sanctions

Mr. Manookian appealed all three of the *Shao* sanction orders issued by Judges Brothers and Ash. *Id.* at *1. On the substance of the sanctions, the intermediate appellate court found that the *Shao* record "clearly supports a finding that Mr. Manookian conducted himself in a reckless manner throughout the course of the underlying litigation" and that

---

fees for his actions; yet, he continues this vendetta." It added: "His actions not only damage his reputation as a professional, but also blemish the legal profession and the integrity of the Court."

[20] On September 21, 2018, the day after Judge Ash's order, the Tennessee Supreme Court entered an order temporarily suspending Mr. Manookian from the practice of law in Tennessee, pursuant to Tennessee Supreme Court Rule 9, section 12.3, based on the Court's finding that he posed a threat of substantial harm to the public. *See In re Brian Phillip Manookian*, *BPR #026455*, No. M2018-01711-SC-BAR-BP (Tenn. Sept. 21, 2018). This is discussed in more detail below.

the trial court did not abuse its discretion in exercising its inherent power to sanction him. *Id.* at \*6.

Mr. Manookian also appealed Judge Brothers's September 2017 order, which forbade Mr. Manookian from "making any communication to counsel in this case that threatens, insults, disparages, demeans, or embarrasses them and/or their family members," as an unconstitutional prior restraint on his right to free speech. *Id.* He argued that the September 2017 order was "not narrowly tailored," did not "serve a compelling governmental interest," and was a "broad prohibition on content-based future speech." *Id.*

The Court of Appeals rejected these arguments. It observed that the Tennessee Rules of Professional Conduct and the Davidson County Local Rules of Practice inherently require attorneys to "conduct themselves in an ethical, civil, and professional manner— and implicit in this requirement is the prohibition on conduct that 'threatens, insults, disparages, demeans, or embarrasses.'" *Id.* The appellate court denied Mr. Manookian any relief on his claims. *Id.*

There was no appeal from the intermediate appellate court's decision.

### Disciplinary Proceedings

On March 22, 2018, the BPR filed a supplemental petition for discipline against Mr. Manookian.[21] The petition was based on Mr. Manookian's email about Mr. Gideon's daughter, as well as the response to Mr. Gideon's motion for sanctions in which Mr. Manookian included an unredacted copy of the email and also inserted Footnote 1 referencing the lawsuit involving Mr. Gideon's son.

On September 21, 2018, several months after the first supplemental petition was filed, the Tennessee Supreme Court entered an order temporarily suspending Mr. Manookian from the practice of law in Tennessee.[22] Under Tennessee Supreme Court Rule

---

[21] BPR's original petition for discipline was voluntarily dismissed without prejudice.

[22] The temporary suspension from September 21, 2018, to May 17, 2019 was due in part to Mr. Manookian's conduct in matters unrelated to *Shao*. It was based on: (1) a July 2018 Williamson County Circuit Court order finding Mr. Manookian in civil contempt of court for engaging in "a knowing, willful, and intentional course of conduct to deceive and defraud [the court]" and "for knowingly, willfully, and intentionally violating [an order of the court] on seven separate occasions"; (2) the Davidson County Circuit Court order reprimanding Mr. Manookian and co-counsel in *Shao* for filing the motion for default judgment on the day opposing counsel died unexpectedly; (3) Mr. Manookian's August 19, 2017 email in *Shao* to Mr. Gideon about his daughter and his August 4, 2018 email to Mr. North referencing his personal details; (4) an August 2017 United States District Court for the Eastern District of Texas order stating that Mr. Manookian deliberately concealed information from the court in 2016, which "constitute[d] fraud and abuse

9, section 12.3, the order was based on the Court's finding that he posed a substantial threat of harm to the public.[23]

Almost immediately, Mr. Manookian filed a petition to dissolve the suspension. *See* Tenn. Sup. Ct. R. 9, § 12.3(d). A hearing panel considered testimony on Mr. Manookian's petition, found no good cause to dissolve the suspension, and recommended denial of the petition.[24] On November 21, 2018, this Court entered an order denying Mr. Manookian's

---

of the judicial process"; (5) an August 2016 Davidson County Chancery Court order granting a permanent injunction against Mr. Manookian from entering an individual's residence or the premises of Nashville Armory, LLC because Mr. Manookian's "erratic behavior" in 2013 caused the individual to fear for his safety; (6) a July 2014 Davidson County Circuit Court order in Mr. Manookian's divorce case finding Mr. Manookian "physically assaulted" his ex-wife "on numerous occasions"; and (7) a Davidson County Circuit Court order enjoining Mr. Manookian from "contacting, calling, communicating, harassing, threatening, abusing, harming, coming into contact, interfering, or coming into proximity of" another individual who had filed a complaint, a motion for restraining order, and an amended complaint alleging that "Mr. Manookian attacked him violently on two occasions." These matters are referenced for context.

[23] Tennessee Supreme Court Rule 9, section 12.3(a) states:

> On petition of Disciplinary Counsel and supported by an affidavit or declaration under penalty of perjury demonstrating facts personally known to affiant showing that an attorney . . . poses a threat of substantial harm to the public, the Court may issue an order with such notice as the Court may prescribe imposing temporary conditions of probation on said attorney or temporarily suspending said attorney, or both.

Tenn. Sup. Ct. R. 9, § 12.3(a).

[24] After hearing testimony, including from Mr. Manookian, the hearing panel rejected Mr. Manookian's position that his conduct did not constitute a substantial threat of harm to the public. It noted that the boundaries of professional conduct are "critical for the proper functioning of the judicial system" and that Mr. Manookian had had those boundaries pointed out to him "by multiple trial judges" in methods ranging from constructive criticism to monetary sanctions, "but none have deterred Mr. Manookian's behavior." It specifically rejected Mr. Manookian's claim of innocuous intentions:

> The argument that Mr. Manookian's emails to Mr. Gideon and to Mr. North were not designed to be threatening to the families of the recipients nor intimidating to the recipients themselves is simply not believable. There is no other reason for the defamatory, insulting and creepily personal information about the attorneys' family members to be included in professional communication between colleagues. An attorney often accepts a degree of hostility in contentious litigation but he or she should not have to accept that spouses or children will be subject to insult and threat.

> Mr. Manookian has not acknowledged that there is anything wrong with his conduct. Consequently, he has taken no steps to assure the panel that the conduct will not be repeated. He did not indicate that he intends to take any steps to address what he considers to be minimally inappropriate behavior—admittedly rude and insulting but, according to

- 19 -

petition. Mr. Manookian soon filed a second petition for dissolution of the suspension. The hearing panel that heard the second petition found no change and concluded that Mr. Manookian continued to be a danger to the public. On February 27, 2019, this Court entered an order denying that petition as well.

In April 2019, Mr. Manookian filed a third petition for dissolution of the suspension. The same hearing panel considered this petition, but this time it recommended dissolution, subject to several conditions. On May 17, 2019, based on the recommendations of the hearing panel, this Court entered an order granting the third petition. The dissolution of the suspension was subject to Mr. Manookian's ongoing compliance with the conditions recommended by the hearing panel.

Days later, on May 24, 2019, the BPR filed a second supplemental petition for discipline against Mr. Manookian. This petition was based on Mr. Manookian's conduct towards Mr. North in *Shao*.[25]

The following month, BPR filed a petition asking the Court to reinstate the temporary suspension of Mr. Manookian's law license. The Court referred the petition to the same hearing panel that had heard Mr. Manookian's second and third petitions for dissolution and had recommended dissolution. BPR then filed a supplemental petition to reinstate the temporary suspension of Mr. Manookian's law license; it was referred to the same hearing panel. The hearing panel held an evidentiary hearing and issued a report recommending that the Court reinstate the temporary suspension.

On October 11, 2019, finding a substantial threat of harm to the public, this Court entered an order reinstating the temporary suspension of Mr. Manookian's law license. The order detailed the basis for the Court's decision:

> In its Report and Recommendation, the Panel outlined testimony at the hearing, including testimony by Mr. Manookian, regarding two incidents. In the first incident, the Panel found that Mr. Manookian improperly

---

Mr. Manookian, not threatening to the public or to the judicial system which serves the public.

The incidents that were the subject of the hearing on Mr. Manookian's temporary suspension are the subject of additional disciplinary proceedings against him. They are not the basis for the disciplinary violations at issue in this appeal, but provide appropriate context in this case. "[T]his Court may take judicial notice of the records of the courts of this state." *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 862 n.5 (Tenn. 2016).

[25] As discussed below at note 28, the second supplemental petition included other complaints as well.

communicated directly with the client of opposing counsel by sending the client an email designed to intimidate the client and undermine the client's relationship with the client's attorney. In the second incident, the Panel found that Mr. Manookian intentionally sent another opposing counsel an email that contained a photograph of the opposing counsel's wife, personal information regarding his wife, and a photograph of opposing counsel's home, causing opposing counsel to be fearful for the safety of his family. The Panel rejected Mr. Manookian's explanations for these incidents and noted that Mr. Manookian has previously been disciplined for sending threatening and coercive emails regarding the families of opposing counsel. The Panel concluded that Mr. Manookian had violated a condition of the Order granting his Petition for Dissolution of Order of Temporary Suspension.

Based upon the Court's review of the Board's petition to reinstate temporary suspension, the Board's supplemental petition to reinstate temporary suspension, and the supporting affidavit and exhibits for both petitions, as well as the Panel's report and recommendation, the Court adopts the Panel's finding that Brian Phillip Manookian, Respondent, has violated a condition of the Order Granting Petition for Dissolution of Order of Temporary Suspension.

The Court finds as well that Mr. Manookian poses a threat of substantial harm to the public.[26]

The same day this order was entered, Mr. Manookian filed a petition to dissolve the reinstated suspension. A few days later, on October 15, 2019, Mr. Manookian filed a supplemental petition for dissolution.

The Court denied the petitions to dissolve the suspension. In its order, the Court noted "the number of hearings that Mr. Manookian has had regarding temporary suspension of his law license," outlined them at some length, and found no factual basis showing good cause to dissolve the suspension. It then held: "The most recent hearing demonstrated ample basis for determining that Mr. Manookian poses a threat of substantial

---

[26] The incidents that were the subject of the hearing on BPR's petition to reinstate the temporary suspension are the subject of additional disciplinary proceedings against Mr. Manookian and are not the basis for the disciplinary violations at issue in this appeal.

harm to the public and for reinstatement of his temporary suspension."[27] Mr. Manookian has remained on suspension since then.

## Disciplinary Hearing

The BPR's supplemental petitions for discipline asserted that, in the course of Mr. Manookian's representation of the plaintiff in *Shao*, he violated numerous Rules of Professional Conduct, including: Rule 1.9(c) (Duties to Former Clients),[28] Rule 4.4(a)(1) (Respect for the Rights of Third Persons),[29] Rule 8.2(a)(1) (Judicial and Legal Officials),[30] and Rules 8.4(a) and (d) (Misconduct).[31]

---

[27] The order added: "Both Mr. Manookian and the Board shall proceed with all due speed toward ultimate resolution of the petition for discipline currently pending before the Board." Originally, the second supplemental petition for discipline also included allegations of conduct in two cases unrelated to the *Shao* case. The first involved a complaint submitted by a Texas business owner, David Blank, through his attorney, alleging misconduct by Mr. Manookian related to *Diamond Consortium, Inc., d/b/a The Diamond Doctor, and David Blank v. Brian Manookian, Cummings Manookian, PLC, and Brian Cummings*, No. 4:16CV94-ALM, a lawsuit filed in the United States District Court for the Eastern District of Texas. The second involved Mr. Manookian's conduct in a Williamson County Circuit Court lawsuit, *David Chase v. Chris Stewart, et al.*, No. 2015-200. In December 2019, after the Court entered its order directing both parties to "proceed with all due speed" toward resolution, the BPR voluntarily dismissed the supplemental petition for discipline based on the Texas litigation. In February 2020, the hearing panel entered an order continuing indefinitely the matters related to *Chase v. Stewart* because the case was pending in the Tennessee Court of Appeals. The disciplinary hearing on the complaints related to the *Shao* case went forward.

[28] A lawyer who has formerly represented a client in a matter . . . shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. Sup. Ct. R. 8, RPC 1.9(c).

[29] "In representing a client, a lawyer shall not . . . use means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ." Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1).

[30] "A lawyer shall not make a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of . . . a judge." Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1).

[31] "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct . . . [and] (d) engage in conduct that is prejudicial to the administration of justice." Tenn. Sup. Ct. R. 8, RPC 8.4(a), (d).

At the three-day hearing, the Board called three witnesses: Mr. Gideon, Mr. North, and Judge Brothers. The substance of the testimony from Mr. North and Mr. Gideon is outlined in the facts above. Mr. Manookian testified, as did Judge Gayden.

Judge Brothers testified about the "course of conduct" he saw from Mr. Manookian in *Shao* while he presided over the case. He first noted Mr. Manookian's motion for default against Mr. Geracioti's client, filed the day Mr. Geracioti died, and Mr. Manookian's letter with an $8,000,000 demand against the estate sent only a few days later. Judge Brothers said he found those actions "bizarre" and strongly reprimanded Mr. Manookian for them.

Judge Brothers then explained why he ordered sanctions against Mr. Manookian for his conduct towards Mr. Gideon, in which he sent Mr. Gideon the email regarding Mr. Gideon's daughter and her employer, included the unredacted email in his response to Mr. Gideon's motion for sanctions, and included Footnote 1 about the lawsuit in which he represented Mr. Gideon's son. Judge Brothers viewed the initial email as clearly part of the *Shao* litigation, an effort to intimidate Mr. Gideon after he sent Mr. Manookian a letter about the *Shao* plaintiff's deficient discovery responses:

> [T]his was not one where . . . there [was] a strike by Mr. Gideon and [Mr. Manookian's email] was a responsive hitback. This was an initial offensive maneuver on the part of Mr. Manookian to embarrass, annoy, and harass Mr. Gideon in an attempt to gain an unfair strategic advantage over him through essentially intimidation. It's letting him know, said, "I know the folks where your daughter works, and you'd better watch out. And it's nice to have friends, because I will tell them what I need to tell them."
>
> That's the way I took it. I think any person, reasonable person looking at it would take it that same way. And I was extraordinarily disappointed that he had not heeded my earlier attempt to correct him.

Judge Brothers rejected Mr. Manookian's assertion that the email showed him "acting properly and behaving properly." Judge Brothers interpreted the email as a threat. He said Mr. Manookian's conduct created "the most unusual situation" he had encountered "in 30 years on the bench . . . [and] 42 years as a lawyer." It was the first time Judge Brothers had ever "used this type of language directing a lawyer to control their tongue and their pen essentially and not threaten or try to embarrass other people."

Judge Brothers said there was no reason for him to recuse himself in *Shao*. He observed that the recusal motion was filed just as defendants' challenges to the testimony of the plaintiff's expert, Dr. Zgoda, had gained traction, and he saw the motion as a way for the plaintiff to "buy some more time."

- 23 -

Judge Brothers denied the motion for disqualification, but in April 2018, he transferred *Shao* "because it was becoming a circus." He was no longer presiding over the litigation by the time Mr. Manookian sent Mr. North the August 3, 2018 email asserting his brother, retired Judge Steve North, made comments critical of Judge Brothers.

Judge Brothers said the corruption allegations against him in Mr. Manookian's letter, sent to *Shao* counsel after Judge Brothers was no longer presiding over the case, were false, offensive, defamatory, unfounded, and an attack on his integrity. Both Mr. Gideon and Mr. North confirmed that the allegations about Judge Brothers's purported corruption were false.

Testifying on his own behalf, Mr. Manookian asserted that his August 19, 2018 email about Mr. Gideon's daughter's employment had nothing to do with *Shao*.[32] Mr. Manookian claimed that, at that time, he was "not particularly involved" in *Shao* and did not learn of Mr. Gideon's August 17 letter on *Shao* discovery deficiencies until after he sent his August 19 email.

As background, Mr. Manookian alleged there had been a "multi-year campaign by Mr. Gideon and one other of his partners to denigrate me, my law firm, and my partner."[33] This perception was "inflamed" when Mr. Gideon testified in Texas litigation against Mr. Manookian. He had this in mind, Mr. Manookian said, when he received a call about Mr. Gideon's daughter:

> And so when I got the call from my friend at [Mr. Gideon's daughter's employer] asking about [Mr. Gideon's] daughter, that's what I was thinking about, was that this man for years, who is my elder and somebody who I greatly, greatly respected and worked for and really thought of as a father figure for a lot of years, had spent so much time trying to run me down.
>
> I got the opportunity to do the same thing back to him and I didn't do it. I didn't want to do it.

---

[32] Although Mr. Manookian's response to Mr. Gideon's motion for sanctions attached an email supposedly from an office employee indicating Mr. Gideon's letter arrived at their office after Mr. Manookian sent his August 19 email, at the hearing, the office employee did not testify, and Mr. Manookian offered no evidence except his own testimony.

[33] The hearing panel observed that Mr. Manookian did not call any witnesses to establish that Mr. Gideon had spent years attacking him, either at Judge Brothers's hearing on sanctions or at the disciplinary hearing.

Asked by the hearing panel about Footnote 1 in his response to Mr. Gideon's motion for sanctions, describing his representation of Mr. Gideon's son in the prior litigation on sexual photos, Mr. Manookian claimed: "[M]y point to the Court and to the judge was, I've never attacked his kid. I don't attack his kids. The only thing I have ever done for his kids on the record is represent one of them." However, he conceded:

> I mean, I think the honest answer is, I wasn't bending over backwards to try to be nice to Mr. Gideon at that point. I think I was angry at what he said about me in his motion for sanctions. And so I described it in the most technical Pharisaical way this is exactly what the complaint says.

The information in Footnote 1, Mr. Manookian said, was taken from the complaint he filed on behalf of Mr. Gideon's son, so it was a matter of public record and available on the clerk's electronic database, CaseLink.[34]

While cross-examining Mr. North, Mr. Manookian played a voice mail recording from Judge North asking Mr. Manookian to call him about Judge Brothers. He asked Mr. North to identify the speaker as his brother. However, Mr. Manookian did not call Judge North as a witness to testify at the disciplinary hearing. Although the phones in Mr. Manookian's office were set up to record all phone calls as the default setting, he did not produce a recording of his alleged conversation with Judge North about Judge Brothers. Mr. Manookian commented that someone must have deleted the recording or recorded over it. He claimed he sought verification of the alleged allegations denigrating Judge Brothers, but neither of the attorneys he contacted verified them. He admitted he had no other source or corroboration for the scandalous assertions about Judge Brothers in the footnote in his letter emailed to all *Shao* counsel.[35]

---

[34]A member of the hearing panel observed:

> "[Y]ou stated before that that was regularly available in CaseLink. Well, CaseLink requires a subscription. Personally, I don't pay it because it's too expensive. So it's not readily available unless I were to walk down to the clerk's office and get it. And yes, I can, but that still doesn't make like I can hit a Google search engine and just pull it up."

[35] While maintaining his comments in the letter to the *Shao* counsel about Judge Brothers's alleged corruption were only conveying Judge Gayden's views, Mr. Manookian also claimed they arose from an incident thirty years earlier, in 1992, in which Judge Brothers was arrested on federal criminal charges of money laundering. In the hearing, Mr. Manookian asked Judge Brothers about the incident, and Judge Brothers admitted it took place. The testimony before the hearing panel also established that Judge Brothers was tried and acquitted of all charges, and went on to serve on the bench for many years thereafter. The hearing panel did not mention this incident in its written findings and apparently gave it no weight in finding that Mr. Manookian knowingly made false allegations of corruption about Judge Brothers. We agree that the decades-old money laundering charges against Judge Brothers, of which he was eventually acquitted, did not establish a reasonable factual basis for Mr. Manookian's allegations of corruption.

Explaining his email about Judge Gayden's purported opinions on Mr. North, Mr. Manookian said Judge Gayden was a close friend and had supposedly shared with him unfavorable opinions about Mr. North, with specific examples.

Mr. Manookian characterized his "motion to disclose," demanding that Judge Brothers disclose statements allegedly showing his bias in *Shao*, as a "polite and politically good way to prompt Judge Brothers to recuse himself from the case without making any accusations." When that did not result in Judge Brothers's recusal, Mr. Manookian indicated at the *Shao* status conference that he would secure Judge Gayden's testimony verifying Judge Brothers's alleged biased remarks. Mr. Manookian claimed that, at the status conference, Mr. North asked if he could "ask Judge Gayden what he thinks about me." According to Mr. Manookian, this comment prompted him to send his Friday evening "Good Friday" email, in which he insinuated that Judge Gayden had also expressed unfavorable opinions about Mr. North.[36]

Asked about his email accusing Mr. North of falsifying the date on the certificate of service for his motion for sanctions, Mr. Manookian commented:

And then the language that's always left out when they quote this is, "I am politely requesting that you acknowledge your false certification by filing a corrected certificate of service with the Court first thing Monday morning, then select a hearing date that complies with the local rules and works for all counsel. Once you do that, I will agree to have this motion heard specially, including earlier than required by the two-week rule, if you prefer, and if Mr. Gideon and Mr. Carter also agree."

So, I am telling him, we can hear this motion quickly.

In response to a question from the hearing panel, however, Mr. Manookian acknowledged he did not say "let's move this date" but instead said, "admit that you committed a fraud upon the Court."[37]

---

[36] Mr. North denied that he made such a statement or that his reputation was ever mentioned "on any level" at the status conference, and he testified Mr. Manookian had no response when Judge Ash had asked him several times why he included that information about Mr. North's reputation in the email.

[37] Mr. North testified, after he was recalled to the stand, that he sent the motion for sanctions by email in addition to U.S. Mail and that Mr. Manookian received the email with the motion the same day the motion was filed.

The hearing panel then asked Mr. Manookian about the August 3, 2018 emails aimed at Mr. North.[38] Mr. Manookian said he sent the Friday evening emails because he "was about to file items" in response to an unidentified filing by Mr. North. Mr. North did not respond, but Mr. Manookian "could see from the email tracking that he was opening the email over and over and over and over." Mr. Manookian said this prompted him to send the email the next day, August 4, to Mr. North and all *Shao* counsel, detailing personal information about Mr. North and his wife.

The hearing panel asked about how Mr. Manookian obtained the very personal information recounted in his email. Mr. Manookian explained he used several expensive applications first created for email marketers, paid for by his firm. They imbedded into the email a tracking mechanism that provided a report with detailed information about each person who opened the email:

> The way that it works is that it embeds a 1 by 1 pixel, a small picture that is tiny. And it's white, so it blends into the background on the email.
>
> If you look at Exhibit 14, . . . you see those little Xs, the little images where it says X? That is the tracking picture. And so each one of those has some type of unique code or name that communicates back to a server when it is opened or viewed or an action is taken.
>
> And so it gives you . . . very accurate and detailed information about who is reading the email, who did they forward it to . . . . [Y]ou can get really valuable information.

Once this application gave Mr. Manookian a physical address where the email was opened, he used another service—one used by private investigators—to acquire still more personal information:

> I then used a service that we have . . . called TLOXP, and it's essentially a database used by skip tracers and private investigators where if you, for example, put in an address . . . you get a report back that's every – all publicly available data that is tied to that address. . . .
> . . . .

---

[38] As discussed above, the first August 3 email was a letter to all *Shao* counsel detailing an alleged phone call with retired Judge Steve North, Mr. North's brother, accusing Judge Brothers of various forms of corruption. The second August 3 email was to Mr. North, with all *Shao* counsel copied, asking him "verify" an attachment as a voicemail from Mr. North's brother.

. . . I ran the TLOXP report for [the address]. And so I got back I think it was close to a 100-page report that said, "This is all the information we have about [the address]. This is where – this is who the utility bills are to. This is, for example, people who've lived here, this is where they have lived before. This is what was paid for the property. This is the VIN and the license plate that are registered to that address."

Perhaps not surprisingly, Mr. Manookian said this email, sent to all of the *Shao* counsel and beyond, "was getting a lot of hits. A lot of people were reading it."[39] His purpose, Mr. Manookian said, was "to confirm that, 'Mr. North, I know you're the one who is reading this at [Mr. North's home address], here is all the information tied to [Mr. North's home address].'"

The panel asked Mr. Manookian if his purpose was to embarrass Mr. North. Mr. Manookian answered, "I wasn't taking any efforts to avoid embarrassing him." He admitted he hoped to embarrass Mr. North because the motions for sanctions against Mr. Manookian included references to Mr. Manookian's divorce and were served on Mr. Manookian's wife, who was co-counsel on the *Shao* case.

Still, Mr. Manookian claimed he now regrets the North emails:

> I regret having sent this email. I shouldn't have done it. I was angry and upset at the multiple times that he would reference interrogatory information about me totally unnecessarily just to serve it on my wife. But I shouldn't have been goaded into this. I shouldn't have done it.

He voiced similar regret about the Gideon emails:

> Mr. Gideon described my apology to him as insincere. It was anything but. I am sorry for any anxiety or anguish that I caused him. I am sorry for the conduct that has resulted in this. And again, it was a lack of judgment and discipline, frankly, and I recognize that.

The final witness called by the Board in rebuttal was Judge Gayden. Contrary to the implications in Mr. Manookian's email to the *Shao* counsel, Judge Gayden testified he had a good opinion about Mr. North's reputation for truth and veracity. Judge Gayden

---

[39] Asked by the hearing panel whether his emails to panel members were imbedded with tracking pictures, Mr. Manookian replied he was no longer using the service because it was expensive.

clarified that his "opinion is that Judge Brothers is not a corrupt judge" and said he had never voiced an opinion to Mr. Manookian that Judge Brothers is corrupt.

That testimony concluded the evidentiary hearing.

**Hearing Panel Report and Recommendations**

On May 20, 2020, the panel filed its report and recommendations. The report opened:

> Lawyers make mistakes. Some lawyers make numerous mistakes.
>
> This matter is not about a lawyer making mistakes. Instead, it is about a lawyer who recklessly accused a judge of being corrupt, repeatedly belittled and degraded opposing counsel, and made a threat against another lawyer's family.
>
> Prior to appearing before this panel, Brian Manookian had a history of failing to adhere to the Rules of Professional Conduct and ignoring warnings from members of the judiciary. He has already been sanctioned and suspended from the practice of law on multiple occasions, yet his unethical conduct continued.

The hearing panel expressly credited the testimony of Mr. Gideon, Mr. North, Judge Brothers, and Judge Gayden. Based on considerable evidence presented at the hearing, the panel concluded that Judge Brothers "has a reputation for being a truthful person and honorable Judge." Also based on substantial evidence at the hearing, it concluded that Mr. North "has a reputation for being a truthful and honest person."

In contrast, the panel noted that substantial testimony showed Mr. Manookian has a well-established reputation for being untruthful, untrustworthy, and dishonest. It noted that Mr. Manookian offered no witnesses or testimony to rebut the substantial evidence establishing his reputation for dishonesty. It observed: "Mr. Manookian did not even ask for an assessment o[f] his reputation when his close personal friend, Judge Gayden, testified."

The panel concluded that Mr. Manookian "has a reputation for being an untruthful and dishonest person." It expressly found that "he was not credible." As a consequence, the panel credited none of Mr. Manookian's testimony.

The BPR argued that Mr. Manookian could not challenge the factual findings and conclusions of law in the orders entered by Judge Brothers and Judge Ash and affirmed by the Court of Appeals, without appeal, based on the doctrine of collateral estoppel. The hearing panel declined to address collateral estoppel because the hearing included "overwhelming and independent evidence that the emails at issue were sent to opposing counsel in the representation of a client for no substantial purpose other than to threaten, insult, disparage, demean, embarrass and/or attempt to intimidate opposing counsel to gain some tactical advantage in the *Shao* case."

The panel concluded that Mr. Manookian violated RPC 8.2(a)(1) by sending the August 3, 2018 letter by email to Mr. North, accusing Judge Brothers of being corrupt. It rejected Mr. Manookian's argument that the statements were protected by the First Amendment. It noted that the letter was sent to opposing counsel during the judicial proceeding and referenced the *Shao* case.

The panel believed that Mr. Manookian's letter constituted in-court speech. However, even if it were considered out-of-court speech, the evidence established decisively that his assertions about Judge Brothers "were false, made with reckless disregard for their truth and made with the intent to impugn Judge Brothers and disrespect the Bench." The panel summarized:

> Should a lawyer have a good-faith basis that a member of the bench is corrupt, he has every right to act accordingly. However, that is not the case here. Mr. Manookian published serious allegations against a sitting judge without any good-faith basis to do so. The panel finds that his serious attack of Judge Brothers's character with reckless disregard for the truth is a violation of Rule 8.2.

The panel next determined Mr. Manookian violated RPC 4.4(a)(1) by sending the emails on August 19, 2017 (regarding Mr. Gideon's daughter), March 30, 2018 (regarding Judge Gayden's alleged opinion of Mr. North), August 3, 2018 (accusing Judge Brothers of being corrupt) and August 4, 2018 (including personal information about Mr. North, his home, his wife, his marriage, and his property). It rejected Mr. Manookian's contention that the August 19, 2017 email about Mr. Gideon's daughter was not sent in the representation of a client. The panel specifically rejected Mr. Manookian's assertion that he was not aware of Mr. Gideon's letter pointing out many discovery deficiencies and that the timing of his email was coincidental. It noted that, at the time the email was sent:

> . . . Mr. Manookian was representing the plaintiff in the *Shao* case and he knew that Mr. Gideon was representing one of the defendants in the *Shao*

case. The email was sent to opposing counsel in the *Shao* case at a time when discovery objections were at issue and being discussed.

Regardless, the panel pointed out, "Mr. Manookian took it a step further and filed an unredacted copy of the August [19], 2017 email in a formal pleading in the *Shao* case on September 5, 2017."

The panel rejected Mr. Manookian's explanations for his conduct. It found:

[T]he emails at issue served no substantial purpose other than to threaten, intimidate, demean, embarrass, harass and distract opposing counsel in the *Shao* case pending in the Circuit Court for Davidson County. None of the communications served to advance the litigation or advocate for Mr. Manookian's clients, which is the role of the trial lawyer.

(footnote omitted).

As to Footnote 1, with information about Mr. Gideon's son, a former client of Mr. Manookian, the panel found that Mr. Manookian violated RPC 1.9(c) by disclosing information that was not generally known. It rejected Mr. Manookian's assertion that there was nothing improper because the complaint was included in public records. It made a factual finding that the information about Mr. Gideon's son had not become generally known and that Footnote 1:

. . . mischaracterized Mr. Gideon's son and the underlying event. The Panel also finds that it was simply not necessary for Mr. Manookian to provide specific information about the case where he represented Mr. Gideon's son. Finally, the Panel finds Mr. Manookian acted knowingly in an effort to embarrass Mr. Gideon and his son, and such misconduct had the potential for serious injury to his former client.

The panel also found that the emails and Footnote 1 Mr. Manookian sent to the *Shao* counsel and others constituted conduct "prejudicial to the administration of justice" in violation of RPC 8.4(d)[40] and the "catchall" provision, RPC 8.4(a).[41] It said that the emails "were intended to, and did, distract opposing counsel and the judge from the underlying

---

[40] "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Tenn. Sup. Ct. R. 8, RPC 8.4(d).

[41] "It is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct . . . ." Tenn. Sup. Ct. R. 8, RPC 8.4(a).

case. Judge Brothers testified that he finally recused himself from the *Shao* case . . . because of repeated efforts by Mr. Manookian to continually interject either problems with counsel or the Court."

To determine the proper discipline, the hearing panel considered the applicable American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards").[42] Under ABA Standards 4.21 and 6.21,[43] the hearing panel concluded that disbarment was the appropriate baseline sanction as to each rule violation. The hearing panel found four aggravating factors: Mr. Manookian's prior discipline, multiple offenses, substantial experience in the practice of law, and refusal to acknowledge the wrongful nature of his conduct. It found no mitigating circumstances.

Despite finding that disbarment was the baseline sanction, without explanation, the hearing panel concluded that Mr. Manookian should be suspended from the practice of law for twenty-four months. It stated that the suspension should begin after the end of any suspensions Mr. Manookian was serving. The hearing panel also found he should complete twelve hours of anger management training before any reinstatement.

## Trial Court Review

Mr. Manookian filed a petition for review of the hearing panel's decision in the Davidson County Chancery Court, under Tennessee Supreme Court Rule 9, section 33.1(a).[44]

---

[42] "In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions." Tenn. Sup. Ct. R. 9, § 15.4(a).

[43] The hearing panel report refers to ABA Standard 4.31, but it appears the panel intended to reference ABA Standard 4.21. The panel report states: "ABA Standard 4.31 addresses conduct in which the attorney act[ing] without the consent of his client, knowingly uses information related to the representation with the intent to benefit the lawyer or another, and cause[s] serious or potentially serious injury to a client." This reflects the language in ABA Standard 4.21, which states: "Disbarment is generally appropriate when a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." In contrast, ABA Standard 4.31 involves conflicts of interest, which are not at issue in this case.

ABA Standard 6.21 provides, "Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding."

[44] This rule provides:

Mr. Manookian argued that the hearing panel proceedings were plagued by errors and that the panel misapplied the disciplinary standards. The Board disputed all of Mr. Manookian's arguments.

The Board further contended that the hearing panel abused its discretion by failing to impose the baseline sanction of disbarment. Mr. Manookian moved to dismiss the Board's claim because the Board did not file its own petition for review under Rule 33.1(a). The trial court granted that motion and did not consider the Board's argument that the hearing panel abused its discretion.[45]

In its analysis, the trial court first addressed Mr. Manookian's argument that, no matter how distasteful his statements may have been, he had the right to make them under the First Amendment of the U.S. Constitution. The trial court noted that the Court of Appeals rejected the free speech argument, and Mr. Manookian did not appeal that ruling. *See Shao*, 2019 WL 4418363, at *6. But the trial court evaluated it anyway.

The trial court observed that all seven communications at issue targeted opposing counsel and the trial judge in a lawsuit where Mr. Manookian represented a party. The statements by Mr. Manookian were made primarily in email communications that "were connected to or arose out of a judicial proceeding, and involved people in that very same judicial proceeding." Applying an objective standard, it held that the statements were not entitled to protection under the First Amendment:

---

> The respondent or petitioning attorney or the Board may appeal the judgment of a hearing panel by filing within sixty days of the date of entry of the hearing panel's judgment a Petition for Review in the circuit or chancery court of the county in which the office of the respondent or petitioning attorney was located at the time the charges were filed with the Board.

Tenn. Sup. Ct. R. 9, § 33.1(a).

[45] The trial court's ruling was based on Tennessee Supreme Court Rule 9 section 33.1(b), which provides that the trial court may reverse or modify the finding of the hearing panel when:

> *the rights of the party filing the Petition for Review have been prejudiced* because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b) (emphasis added). This is discussed further below.

Mr. Manookian's numerous statements were made in the course of a judicial proceeding but had no relevance to that proceeding. There was no purpose to the statements other than to intimidate or offend the opposing counsel or the trial court. Furthermore, no reasonable attorney would have acted as Mr. Manookian. Even though the trial court sanctioned Mr. Manookian on three occasions, he remained undeterred.

After rejecting Mr. Manookian's First Amendment argument, the trial court considered Mr. Manookian's procedural arguments and rejected those as well. It held that the findings of the hearing panel as to violations of the Rules of Professional Conduct were not arbitrary or capricious, and were supported by evidence that is both substantial and material, in light of the entire record.

The trial court then considered the sanction recommended by the hearing panel. It rejected Mr. Manookian's contention that the sanction was too harsh. It agreed with the Board that the hearing panel's decision to deviate downward from the presumptive sanction of disbarment, with no explanation or finding to support the downward deviation, was arbitrary and capricious. Had the Board correctly appealed this issue, the trial court said, it "would have imposed a sanction of disbarment." It added that, "while Mr. Manookian may believe the sanction is unduly harsh, it is significantly less than what it should have been." The trial court affirmed the decision of the hearing panel.

The Board filed a notice of appeal under Tennessee Supreme Court Rule 9, section 33.1(d).[46] Mr. Manookian also filed a notice of appeal. This Court consolidated the appeals and designated the Board as the appellant.

## STANDARD OF REVIEW

Disciplinary Counsel of the Board of Professional Responsibility is charged with investigating complaints against attorneys in Tennessee. Tenn. Sup. Ct. R. 9, § 15.1(b). When an investigation results in a petition for discipline against the attorney, the evidentiary hearing is conducted by a hearing panel, Tenn. Sup. Ct. R. 9, § 15.2(a), and the Board has the burden of proving the charges of misconduct by a preponderance of the evidence. Tenn. Sup. Ct. R. 9, § 15.2(h). "In determining the appropriate type of

---

[46] "Either party dissatisfied with the decree of the circuit or chancery court may prosecute an appeal directly to th[is] Court." Tenn. Sup. Ct. R. 9, § 33.1(d). The Board also cited Tennessee Rule of Appellate Procedure 3(a) as a basis for its appeal. Tenn. R. App. P. 3(a) ("In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right.").

discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions." Tenn. Sup. Ct. R. 9, § 15.4(a).

Either party may appeal the judgment of the hearing panel by filing a petition for review in the circuit or chancery court. Tenn. Sup. Ct. R. 9, § 33.1(a). On appeal, the trial court

> may reverse or modify the decision if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b). "A hearing panel abuses its discretion if it 'appl[ies] an incorrect legal standard or reach[es] a decision that is against logic or reasoning that causes an injustice to the party complaining.'" *Bd. of Pro. Resp. v. Parrish*, 556 S.W.3d 153, 163 (Tenn. 2018) (alteration in original) (quoting *Sallee v. Tenn. Bd. of Pro. Resp.*, 469 S.W.3d 18, 42 (Tenn. 2015)). "The trial court reviews questions of law de novo with no presumption of correctness, but does not substitute its judgment for that of the hearing panel on questions of fact." *Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Prewitt*, 647 S.W.3d 357, 366 (Tenn. 2022) (citing *Napolitano v. Bd. of Pro. Resp.*, 535 S.W.3d 481, 496 (Tenn. 2017)). Any party dissatisfied with the ruling of the trial court may appeal to the Supreme Court. Tenn. Sup. Ct. R. 9, § 33.1(d).

## ANALYSIS

The ultimate issue before the Court is whether the sanction imposed by the hearing panel is appropriate under the circumstances. We first consider preliminary matters raised by Mr. Manookian, then review the rule violations and attorney misconduct, and then discuss both parties' arguments on the sanction. *See In re Sitton*, 618 S.W.3d 288, 295 (Tenn. 2021).

## I. <u>Issues Raised by Mr. Manookian</u>

### A. Procedural Error

Mr. Manookian argues he has the right to a new evidentiary hearing because of procedural defects in the hearing panel proceedings that render them "made upon unlawful

procedure" under Tennessee Supreme Court Rule 9, section 33.1(b).[47] His complaints focus on issues surrounding a replacement panel member and the lack of a transcript of the opening and closing statements.

Here are the relevant facts: On March 13, 2020, after Mr. Manookian's hearing concluded but before the panel issued its judgment, an attorney who was a member of the hearing panel decided to apply for a job the BPR posted. That day, he sent notice via email to both parties and the other hearing panel members that he intended to apply for a Board position. He offered to step down from the case if there were any objections. About an hour later, the panel invited any objections, and Mr. Manookian responded with his objection. Mr. Manookian also moved to disqualify the panel member from participating in the case. On March 17, the initial hearing panel member gave notice that he was voluntarily stepping off the panel, rendering Mr. Manookian's motion to disqualify moot. On March 20, the initial member was replaced by a new member who participated in the final decision.

A few days later, the Board filed a transcript of the testimony with the hearing panel, including the replacement member, and sent a copy of the transcript to Mr. Manookian, who used it to prepare proposed findings of fact and conclusions of law he submitted to the hearing panel on April 20, 2020. Subsequently, the replacement panel member joined the hearing panel's May 20, 2020, Report and Recommendation. The opening and closing statements were not transcribed.

Mr. Manookian raises several alleged improprieties. He is concerned that (1) the replacement panel member did not review the exhibits and transcript of the testimony provided to him; (2) the transcript provided did not include the opening and closing statements; (3) the replacement member did not see the witnesses testify and could not properly evaluate their credibility; (4) the hearing panel violated its rules by not providing notice that only part of the transcript had been ordered; and (5) the hearing panel misled him by not telling him it had provided an incomplete transcript.[48]

---

[47] Tennessee Supreme Court Rule 9, section 33.1(b), provides the decision of the hearing panel may be modified or reversed if the rights of the petitioner "have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are . . . made upon unlawful procedure." Tenn. Sup. Ct. R. 9, § 33.1(b).

[48] Mr. Manookian also contends that the panel chair improperly signed the name of the replacement panel member to the final written decision, and argues this supports his contention that the replacement panel member did not review the entire transcript of the testimony before the written decision was issued. Having the panel chair sign the name of a replacement panel member to the final written decision with permission is not an unusual occurrence and does not support any inference about what any of the panel members did or did not review. This issue is without merit.

Mr. Manookian offers no evidence to support his concern that the replacement panel member did not review the exhibits and testimony provided to him, and we find none in the record. This issue is without merit.

In addressing these issues, the trial court ruled there was no procedural error because the replacement panel member did not need to review the opening and closing arguments, the withdrawal of the original panel member did not affect the process, and two out of the three panel members, *i.e.*, a majority, saw and heard the witnesses testify. We agree.

Omitting the opening and closing statements from the transcript provided to the panel members did not render the transcript incomplete. They received the exhibits and a transcript of the testimony.[49] It is axiomatic that opening statements and closing arguments are not evidence. *See, e.g.*, *Bradley v. Bishop*, 538 S.W.3d 518, 534 (Tenn. Ct. App. 2017) (trial court gave curative instruction reminding jury that opening statements are not evidence and "the jury must only consider the presentation of testimony, depositions, exhibits, and stipulations as evidence"); *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978).

It was not necessary for the replacement member to observe the witnesses' demeanor at trial; there was ample evidence in the transcript about witnesses' credibility to let the replacement member evaluate their credibility. A majority of the panel observed all of the witnesses' demeanor. Multiple witnesses testified that both Judge Brothers and Mr. North had a reputation for honesty and truthfulness. And multiple witnesses gave uncontradicted testimony that Mr. Manookian had a well-established reputation for dishonesty.

The Board did not violate its procedure for the transcript, nor did it mislead Mr. Manookian. After the hearing, a scheduling order directed the Executive Secretary to distribute the complete hearing transcript to the hearing panel; it did not ask for only a portion. Moreover, had the panel asked for a partial transcript, Mr. Manookian could have asked for the rest of it.[50] He did not do so.

---

[49] In his brief, Mr. Manookian relies on cases that involve the deprivation of constitutional rights of criminal defendants. These cases are inapposite. "As this Court has repeatedly held, attorney disciplinary proceedings are not criminal proceedings." *Harris v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 645 S.W.3d 125, 136 (Tenn. 2022).

[50] *See* Tenn. Sup. Ct. R. 9, § 34.1(a) ("If [a] request is made by the hearing panel for only a portion of the transcript, either Disciplinary Counsel or the respondent or petitioning attorney may request in writing from the Chair authorization for transcription of any other portion of the hearing for completeness.").

And the record contradicts Mr. Manookian's assertion that he did not know until December 2020 that the transcript of the hearing did not include the opening statements and closing arguments. On the same day the Board filed the transcript with the hearing panel, with a certificate of service to Mr. Manookian, an email from the Board's Executive Secretary shows that she sent notice of the transcript filing, along with "the currently available transcript" to each of the hearing panel members, the Board's attorney, and Mr. Manookian. On April 20, 2020, Mr. Manookian submitted proposed findings of facts and conclusions of law to the hearing panel in which he repeatedly referred to the transcribed testimony. And on May 20, 2020, the Board's Executive Secretary emailed Mr. Manookian, informing him she had no record of having received the transcript of the opening statements and closing arguments and noting that he had only requested that the court reporter prepare the transcript of the evidence.

We agree with the trial court that there was no procedural error in Mr. Manookian's hearing that justifies reversal.

## B. First Amendment

Mr. Manookian makes several arguments that disciplining him for the conduct at issue violates the First Amendment of the U.S. Constitution. U.S. Const. amend. I. In the main, he argues that all of his statements fall into categories of speech that are protected under the First Amendment; that our ethics rules for attorneys are content- and viewpoint-based, in violation of the First Amendment; that some of his communications are properly categorized as out-of-court statements that should be analyzed differently from in-court statements; and that some of his statements constitute truthful speech and speech in public records that are protected under the First Amendment.

At the outset, we note that, while appealing the sanctions imposed on him by the *Shao* trial court, Mr. Manookian argued to the Court of Appeals that all of this same conduct was protected under the First Amendment. *Shao*, 2019 WL 4418363, at *6. The Court of Appeals rejected the argument that the trial court sanctions were unconstitutional, in violation of his right to free speech. *Id.* Mr. Manookian chose not to appeal, and that decision is final.[51]

---

[51] We note that Mr. Manookian did not appeal the intermediate appellate court's adverse decision for context only; the Board does not argue to us that Mr. Manookian is collaterally estopped from relitigating his First Amendment arguments in this appeal, and we do not consider collateral estoppel in our decision. *See Mullins v. State*, 294 S.W.3d 529, 534 (Tenn. 2009) (describing collateral estoppel as a doctrine that "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding.").

In Mr. Manookian's disciplinary proceedings, the same First Amendment arguments were rejected by the hearing panel, and also by the trial court in the appeal from the hearing panel's decision. We consider them now.

We first outline the applicable First Amendment analysis, then discuss the purpose of the conduct at issue, and finally review the individual rule violations.

## 1. First Amendment Overview

The free speech clause of the First Amendment to the United States Constitution applies to the states through the Fourteenth Amendment[52] and provides: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[53] This Court has recognized that citizens who choose to become lawyers do not surrender their First Amendment right to free speech. *Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Slavin*, 145 S.W.3d 538, 549 (Tenn. 2004) ("[L]awyers do not check their First Amendment rights at the courthouse door[.]").

The United States Supreme Court has recognized, however, that the First Amendment does not offer unbounded protection to attorney speech. "Membership in the bar is a privilege burdened with conditions." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1066 (1991) (internal quotation marks omitted) (citing *Theard v. United States*, 354 U.S. 278, 281 (1957) (quoting *In re Rouss*, 116 N.E. 782, 783 (N.Y. 1917) (Cardozo, J.)). This Court has recognized this principle as well. *See Parrish*, 556 S.W.3d at 165 (listing courts that have "rejected the proposition that the First Amendment provides absolute protection to attorney speech").[54] Indeed, historically, the courts have long regulated the practice of law "and exercised the authority to discipline and ultimately to disbar lawyers whose conduct departed from prescribed standards." *Gentile*, 501 U.S. at 1066.

The scope and extent of a lawyer's right to free speech may be tempered by the context in which the speech occurs. "[W]hen it comes to analysis under the First Amendment, . . . rights have always depended largely upon the nature of the forum." *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005), *cert. denied*, 547 U.S. 1111 (2006). "[I]n the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." *Gentile*, 501 U.S. at 1071. This Court has

---

[52] *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

[53] The Tennessee Constitution also protects the right to free speech. *See* Tenn. Const. art. I, § 19.

[54] *See also In re Comfort*, 159 P.3d 1011, 1027 (Kan. 2007) ("A lawyer's right to free speech is tempered by his or her obligation to both the courts and the bar, an obligation ordinary citizens do not undertake.").

likewise held that "[t]he First Amendment does not preclude sanctioning a lawyer for intemperate speech during a courtroom proceeding." *Slavin*, 145 S.W.3d at 549 (internal quotation marks omitted) (quoting *Jacobson v. Garaas*, 652 N.W.2d 918, 925 (N.D. 2002)) (emphasis removed). In the courtroom, a lawyer's right to free speech is "often subordinated to other interests inherent in the judicial setting." *Id.* In *Slavin*, the trial judge imposed discipline on the attorney for remarks in court or in pleadings, "[w]ithout even considering whether these representations are truthful or not," because they were degrading, demeaning, and "prejudicial to the administration of justice." *Id.* at 544. This Court affirmed, holding that the attorney's "in-court remarks were not protected by the First Amendment." *Id.* at 550.

On the other end of the spectrum, this Court has held that an attorney's public statements critical of the judiciary, made to the media outside the courtroom, not in pleadings and not in the context of representation in a specific pending case, were entitled to First Amendment protection. *Ramsey v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 771 S.W.2d 116, 120–22 (Tenn. 1989). The *Ramsey* Court sought to "balance . . . a lawyer's right to speak, the right of the public and the press to have access to information, and the need of the bench and bar to [e]nsure that the administration of justice is not prejudiced by a lawyer's remarks" and also "ensure that lawyer discipline . . . does not create a chilling effect on First Amendment rights." *Id.* at 121. The Court recognized that, for speech outside the context of a pending, specific case, lawyers may be disciplined if the speech is "designed to willfully, purposely and maliciously misrepresent the judges and courts of this State, and to bring those persons and institutions into disrespect." *Id.* at 122. It added, "There is no First Amendment protection for remarks critical of the judiciary when those statements are false." *Id.* The Court held that, while the attorney's remarks "were disrespectful and in bad taste," they were protected as within the attorney's right to free speech. *Id.* Using the lawyer disciplinary rules to sanction the attorney's remarks to the media in that case, the Court said, "would be a significant impairment of First Amendment rights." *Id.*

One of the statements at issue here was made in a pleading filed in the pending *Shao* case. Statements in pleadings were deemed in *Parrish* to be in-court speech. 556 S.W.3d at 167 (statements in motions for reconsideration and recusal that impugned the integrity of the appellate judges described as "in-court statements"). The other statements, however, occurred in emails to opposing counsel and other persons in the context of Mr. Manookian's representation of the *Shao* plaintiff while the case was pending. This Court has not addressed attorney speech in this setting, not exactly in-court but nevertheless made during and in the context of the lawyer's representation in a specific, pending case.

But other courts have. Courts have let the government limit the speech of lawyers when the speech pertains to a pending judicial proceeding or when it prejudices the

administration of justice. *See Gentile*, 501 U.S. at 1072. "[L]awyers in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be." *Id.* at 1071 (citing *In re Sawyer*, 360 U.S. 622 (1959)). Some courts reason that "an attorney, by the very nature of his job, voluntarily agrees to relinquish his rights to free expression in the judicial proceeding . . . ." *Mezibov*, 411 F.3d at 719.

Gentile*, for example, involved out-of-court statements by a lawyer who represented a party to a pending proceeding in court. 501 U.S. at 1063–64, 1070. The United States Supreme Court commented in that case that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard" than the standard for regulation of the press. *Id.* at 1074. It described a balancing process in such cases, in which the court "weighs the State's interest in the regulation of a specialized profession against the lawyer's First Amendment interest in the kind of speech that was at issue." *Id.* at 1050–51. This balancing process gives appropriate weight to "the vital role that the justice system plays in our society and the state's unique interests in regulating the legal profession." *Matter of Abrams*, 488 P.3d 1043, 1051 (Colo. 2021).

State courts that have addressed lawyer speech outside the courtroom but in a pending case have reasoned that such speech "'may be regulated under a less demanding standard' because the lawyer in that role is an officer of the court." *Id.* (quoting *Gentile*, 501 U.S. at 1074–75); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 90 (Iowa 2008) (stating it is "well established that the speech of lawyers may be curtailed in order to avoid improper influence on pending cases . . . to otherwise prevent the obstruction of justice."). The U.S. Supreme Court views the State's interest similarly, noting that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *In re Primus*, 436 U.S. 412, 422 (1978) (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975)).

To evaluate the lawyer's interest in the *Gentile* balancing process, we consider not only the context but also the purpose of the speech. For example, "[l]awyer speech that advances client interests, checks governmental power, or advocates on matters of public concern is provided the utmost protection under the First Amendment." *Matter of Abrams*, 488 P.3d at 1051 (citing *In re Primus*, 436 U.S. at 426–29). *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 429–30 (1963) (solicitation of clients for purpose of engaging in litigation as a form of political expression protected under the First Amendment).

In the balancing process, lawyer speech for such purposes would be weighed heavily. As discussed below, however, none of Mr. Manookian's speech was for a purpose provided this high level of First Amendment protection.

## 2. Context and Purpose of Mr. Manookian's Speech

To determine Mr. Manookian's First Amendment interests, we consider the context and purpose of his speech. In doing so, it is important to recognize that the incidents of misconduct in this appeal are not disconnected from one another. The hearing panel disciplined Mr. Manookian for these incidents:

(1) August 19, 2017 email to Mr. Gideon about Mr. Gideon's daughter's new employment, found by the hearing panel to be in response to Mr. Gideon being substituted in as defense counsel in *Shao*;

(2) September 5, 2017 "Footnote 1" filing in *Shao* in response to Mr. Gideon's motion for sanctions, which included unredacted information about Mr. Gideon's daughter as well as Footnote 1 about the lawsuit in which Mr. Manookian represented Mr. Gideon's son;

(3) March 30, 2018 "Good Friday" email with subject line *Shao* to Mr. North insinuating that Judge Gayden harbored beliefs that Mr. North had a propensity for dishonesty, exaggeration, and falsehood;

(4) June 7, 2018 email with subject line *Shao* to Mr. North with demeaning and insulting language, in violation of Judge Brothers's order;

(5) June 22, 2018 email with subject line *Shao* accusing Mr. North of dishonesty in the certificate of service for Mr. North's motion for sanctions;

(6) August 3, 2018 email to all counsel in *Shao* "disclosing" voicemail from Mr. North's brother, retired Judge Steve North, and describing allegations that Judge Brothers is "corrupt"; and

(7) August 4, 2018 email in *Shao* to Mr. North stating that he could see his previous email "being repeatedly opened" and including detailed personal information about Mr. North and his wife.

As to context, all of these instances of misconduct occurred in the course of the *Shao* litigation.[55] The conduct was part and parcel of Mr. Manookian's representation of the plaintiff in *Shao*.[56]

As to purpose, the hearing panel found that the overarching purpose of all of Mr. Manookian's communications was the same: to gain unfair tactical advantage in *Shao*. Through his conduct, Mr. Manookian made it clear to all that, if lawyers or judges took strong legal positions adverse to him or sought to impose consequences on him, they and their families would soon regret it.

This purpose is perhaps best exemplified by Mr. North's reaction when he saw Mr. Manookian's 2017 conduct aimed at Mr. Gideon's children. Although Mr. North was not yet the target, seeing Mr. Manookian's behavior towards Mr. Gideon caused Mr. North to recognize that Mr. Manookian was willing "to go after somebody's family." He thought, if Mr. Manookian is "willing to publicly humiliate Mr. Gideon's daughter in order to try to gain a tactical advantage in [the *Shao*] case, . . . he would do it against me."

Mr. North's reaction does not appear to be an inadvertent after-effect of the events. Mr. Manookian's conduct served not only to intimidate the immediate target, but also achieve litigation success—unrelated to his lawyering ability or the merits of the case—by prompting other counsel to stand down rather than risk personal humiliation and emotional distress for them or their families.

Consistent with this pattern is Mr. Manookian's decision to allege, falsely and without evidence, that retired Judge North had repeatedly described Judge Brothers as "corrupt," long after Judge Brothers voluntarily removed himself from the case. Beyond the immediate goal of creating family friction and discomfort for Mr. North, the incident would show future judges what lay in store for them if they tried to impose consequences

---

[55] Mr. Manookian argues that his initial August 19, 2017 email to Mr. Gideon about Mr. Gideon's daughter was a friendly message to a former colleague and not related to Mr. Gideon's substitution as defense counsel in *Shao*. But the hearing panel made a factual finding to the contrary, and it is well supported by the evidence. The hearing panel found that, at the time Mr. Manookian sent the August 19 email, "Mr. Manookian was representing the plaintiff in the *Shao* case and he knew that Mr. Gideon was representing one of the defendants in the *Shao* case. The email was sent to opposing counsel in the *Shao* case at a time when discovery objections were at issue and being discussed." The hearing panel also noted that, in case there were any doubt the email was associated with the *Shao* case, Mr. Manookian connected it by attaching the same email, in unredacted form, to his response to Mr. Gideon's motion for sanctions. All of the remaining instances of misconduct were either pleadings filed in *Shao* or emails with *Shao* in the subject line.

[56] Thus, in this opinion, we do not address out-of-court attorney speech with no nexus to the attorney's representation in a pending case.

on Mr. Manookian for unethical behavior.[57]  "[A] system in which intimidating attacks are permitted fosters the risk of eventually realizing the intended effect of such attacks: a potentially cowed judiciary."  *Grievance Adm'r v. Fieger*, 719 N.W.2d 123, 141 (Mich. 2006).

Thus, none of Mr. Manookian's communications were for a purpose such as advancing legitimate client interests, checking government power, or advocating on a matter of public concern.  As the hearing panel put it: "None of the communications served to advance the litigation or advocate for Mr. Manookian's clients, which is the role of the trial lawyer."  The purpose of all of the communications at issue was to gain unfair tactical advantage for Mr. Manookian in *Shao* by intimidating, demeaning, embarrassing, disparaging, and threatening opposing counsel in their personal capacity, and causing them to fear for the well-being and even the safety of their families.

In light of this context and purpose, we consider the State's interest in disciplining Mr. Manookian for specific rule violations and weigh it against Mr. Manookian's First Amendment interests.

### 3.  *First Amendment and Specific Rule Violations*

RPC 8.4(d)

Rule 8.4(d) of Tennessee's Rules of Professional Conduct prohibits attorneys from "engag[ing] in conduct that is prejudicial to the administration of justice."  Tenn. Sup. Ct. R. 8, RPC 8.4(d).  It is intended to protect our system of justice and ensure a fair, impartial judicial system.[58]  *Id.*  In this case, the hearing panel found, and the trial court affirmed, that all of the communications in this appeal violated Rule 8.4(d).

Mr. Manookian observes that some of the communications at issue were in emails and categorizes his speech as out-of-court speech.  He contends that this Court cannot apply Rule 8.4(d) to regulate out-of-court speech.

---

[57] Apart from Mr. Manookian's efforts in *Shao* to pressure Judge Brothers into recusal, the record indicates that, prior to *Shao*, cases involving Mr. Manookian, often included motions for recusal of trial judges based on allegations of bias or misconduct.

[58] In *Howell v. State Bar of Texas*, 843 F.2d 205 (5th Cir. 1988), the Fifth Circuit reviewed Texas's version of Rule 8.4(d) under the First Amendment.  *Id.* at 207–08.  The federal court rejected the argument that it was vague and overbroad, and it held that the rule was consistent with "the State's primary concern . . . the obligation of lawyers in their quasi-official capacity as 'assistants to the court.'"  *Id.* at 207.

Not so.  Some of Mr. Manookian's speech would be in-court speech in the form of pleadings.  *Parrish*, 556 S.W.3d at 167 (holding statements in recusal motions were in-court statements).  But, as we have noted, all of the communications occurred in the context of Mr. Manookian's representation of a client in a specific, pending case.  As pointed out in *Gentile*, "Lawyers representing clients in pending cases are key participants in the . . . justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct."  501 U.S. at 1074.

In the *Gentile* balancing process, the State's interest in protecting the administration of justice weighs heavily.  "A state's interest in regulating attorney speech is at its strongest when the regulation is necessary to preserve the integrity of the justice system . . . ."  *Matter of Abrams*, 488 P.3d at 1051.  "It is essential to the orderly administration of justice and for the preservation of its own dignity and honor that the officers of the court should be honorable in their dealings, not only with the court but with each other."  *State v. Bomer*, 162 S.W.2d 515, 521 (Tenn. 1942).

We give no weight in the balancing process to Mr. Manookian's interest in acquiring unfair tactical advantage through intimidating, embarrassing, debasing, and threatening opposing counsel personally and causing them concern for the well-being and safety of their families.  Mr. Manookian cites no case, and we have found none, where lawyer speech in a pending case whose sole purpose was to coerce unfair strategic advantage by terrorizing opposing counsel and their families outweighed the State's interest in regulating such speech.  RPC 8.4(d) does not run afoul of the First Amendment as applied to Mr. Manookian's communications.

RPC 4.4(a)(1)

RPC 4.4(a)(1) prohibits lawyers, "[i]n representing a client," from using "means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ."  Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1).  Here, the hearing panel found, and the trial court affirmed, that Mr. Manookian violated RPC 4.4(a)(1) in:  (1) his August 19, 2017 email sent to opposing counsel Mr. Gideon regarding his daughter; (2) his March 30, 2018 email sent to opposing counsel Mr. North and others regarding Judge Gayden's purported low opinion of Mr. North; (3) his August 3, 2018 email and attached letter sent to opposing counsel Mr. North and others claiming that retired Judge North had accused Judge Brothers of being corrupt; and (4) his August 4, 2018 email sent to opposing counsel Mr. North and others regarding Mr. North and his family.

Mr. Manookian first argues that the information in these communications was truthful.  He contends that the Board lacks authority to prohibit the transmission of truthful information under Rule 4.4(a)(1).

Mr. Manookian is incorrect. First and foremost, this Court pointed out in *Slavin* that lawyer speech "need not be false" to warrant disciplinary action: "Respondent appears to believe that truth or some concept akin to truth, such as accuracy or correctness, is a defense to the charge against him. In this respect he has totally missed the point." 145 S.W.3d at 549 (quoting *Ky. Bar Ass'n v. Waller*, 929 S.W.2d 181, 183 (Ky. 1996) (holding that lawyer's in-court speech was not protected by the First Amendment)).

Moreover, these emails cannot be regarded as "truthful." Like many of the most insidious untruths, the August 2017 email about Mr. Gideon's daughter was an amalgam of accurate facts, distortions, an outright lie, and strategic omissions, which taken together left an untrue impression. As to retired Judge North's purported unflattering opinion of Judge Brothers, despite Mr. Manookian's claim that Judge North told him such things, the alleged recording of the conversation was never produced,[59] Judge North did not testify, and the only evidence of it was testimony from Mr. Manookian, who was deemed not credible by the hearing panel. Judge Brothers himself testified that the statements were untrue and that Mr. Manookian probably manufactured them. This is not an unreasonable inference.

Mr. Manookian next contends that his speech, in the form of emails to opposing counsel and other people, was out-of-court speech.[60] RPC 4.4(a)(1) regulates lawyer communications and conduct "[i]n representing a client." Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1). Here, all of the speech was found by the hearing panel to have been made in the context of the *Shao* case, part of Mr. Manookian's representation of the *Shao* plaintiff, and this finding is well supported in the record. As explained above, government may limit the speech of lawyers when the speech is in the context of a pending judicial proceeding. *Gentile*, 501 U.S. at 1072.

Mr. Manookian concedes that his speech may have been "embarrassing." Still, he maintains, embarrassing speech is protected by the First Amendment.

Zealous advocacy for a client in a specific pending case may involve speech that creates unease in other participants; for example, strong merit-based criticism of opposing counsel's arguments may leave him or her discomfited. That such advocacy may prove incidentally embarrassing does not bring it under RPC 4.4(a)(1); the rule only prohibits

---

[59] Mr. Manookian played a recording at the disciplinary hearing, but it was only of an inconclusive voicemail that contained none of the unflattering opinions of Judge North claimed by Mr. Manookian.

[60] As the hearing panel noted, Mr. Manookian included his August 19, 2017 email about Mr. Gideon's daughter, in unredacted form, in a pleading filed in the *Shao* case.

lawyers from using "means that have *no substantial purpose other than* to embarrass, delay, or burden a third person." Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1) (emphasis added).

Here, the embarrassing aspect of the speech was not incidental; it was the point. This was not zealous advocacy; the hearing panel found that *none* of the communications served to advance the litigation or advocate for Mr. Manookian's client. They served no substantial purpose other than to threaten, intimidate, demean, embarrass, and harass opposing counsel in the pending *Shao* case. Again, Mr. Manookian cites no case, and we have found none, where lawyer speech in a pending case whose purpose was to coerce, embarrass, and burden opposing counsel and their families outweighed the State's interest in regulating such speech. We conclude that disciplining Mr. Manookian for his misconduct under RPC 4.4(a)(1) does not violate the First Amendment.

RPC 8.2(a)(1)

Rule 8.2(a)(1) prohibits lawyers from making "a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of . . . a judge." Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1). The hearing panel found that Mr. Manookian violated RPC 8.2(a)(1) in footnote 1 of his August 3, 2018 letter sent to opposing counsel Mr. North and other people, in which he claimed that Mr. North's brother, retired Judge Steve North, told him in a telephone conversation that Judge Brothers was corrupt.

First, the hearing panel found that the central message conveyed in the footnote, that Judge Brothers was corrupt, was false.[61] This finding was well founded in the evidence. The testimony from all of the witnesses except Mr. Manookian supports the hearing panel's finding that Judge Brothers was widely regarded as "a truthful person and honorable Judge." Mr. Manookian presented no significant evidence to the contrary.

The second element in Rule 8.2(a)(1) is that the attorney's false statement about the qualifications or integrity of a judge must have been made with "reckless disregard as to its truth or falsity." Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1). At times this has been compared to the standard for defamation of a public official, where the plaintiff must show under a subjective standard that the defendant was aware that the statement was probably false. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (liability for a defamation of a public official requires proof that the statement was both false and made

---

[61] Mr. Manookian claimed he was only transmitting retired Judge North's purported opinion that Judge Brothers was corrupt. We agree with the hearing panel that the essential message conveyed by Mr. Manookian in footnote 1 of the letter was an assertion that Judge Brothers was in fact corrupt.

with "actual malice," i.e., made either with knowledge that it was false or with reckless disregard as to its truth or falsity).[62]

Noting that "the United States Supreme Court has never extended the *Sullivan* standard to attorney discipline," this Court has applied an "objective" standard to the knowledge component of RPC 8.2(a)(1), at least for in-court statements in pleadings. *Parrish*, 556 S.W.3d at 165. Under the objective standard, "the court assesses the statements in terms of what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances … [and] focus[ing] on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made." *Id.* at 165–66 (quoting *Disciplinary Couns. v. Gardner*, 793 N.E.2d 425, 431 (Ohio 2003)) (internal quotations omitted). *Parrish* explained that, "[i]t is the reasonableness of the belief, not the state of mind of the attorney, that is determinative." *Id.* at 166 (quoting *Matter of Holtzman*, 577 N.E.2d 30, 34 (N.Y. 1991)). Under this standard, an attorney may be sanctioned under RPC 8.2(a)(1) for making false statements about the integrity of a judge if a reasonable attorney would have been aware that the statements were likely false.

In *Parrish*, this Court observed that most courts that use the objective standard "have not drawn a distinction between in-court and out-of-court statements in considering the issue and have adopted an objective standard in determining whether attorney speech is entitled to First Amendment protection." *Id.* at 165 (citing many other jurisdictions). *Parrish* adopted the objective standard but limited its holding to attorneys' in-court statements in violation of RPC 8.2(a)(1). *Id.* at 165–66.

As described above, the statements in this case not made in pleadings were still made in the context of Mr. Manookian's representation of his client in *Shao*. This includes the emailed letter about Judge Brothers's alleged corruption. We do not go so far as the hearing panel and categorize emails as the equivalent of "in-court" speech, but communication among counsel made in pending litigation is clearly adjacent to in-court speech. The United States Supreme Court in *Gentile* considered both types of attorney speech similarly. It noted that the Court in past cases "expressly contemplated that the speech of *those participating before the courts* could be limited" and instead distinguished "between participants in the litigation and strangers to it." *Gentile*, 501 U.S. at 1072–73 (emphasis in original).

---

[62] The "reckless disregard" for the truth standard in *New York Times* "requires more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Instead, the "standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

In explaining the decision to adopt an objective standard for in-court speech, *Parrish* observed that "application of the subjective 'actual malice' standard of *Sullivan* to attorney discipline 'would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts about their truth.'" 556 S.W.3d at 165 (quoting *Matter of Holtzman*, 577 N.E.2d at 34). It differentiated between a defamation action, which redresses a wrong to an individual, and an attorney disciplinary action, where "the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations," adding that "[u]nwarranted statements criticizing judges only serve to weaken the public's trust in the judicial system." *Id.* at 166 (citing *In re Cobb*, 838 N.E.2d 1197, 1213 (Mass. 2005)).

Those same considerations are present here. The objective standard adopted in *Parrish* is appropriate to apply to Mr. Manookian's statement about Judge Brothers. As with in-court speech, "[t]he standard applied must reflect that level of competence, of sense of responsibility to the legal system, of understanding of legal rights and of legal procedures to be used only for legitimate purposes and not to harass or intimidate others, that is essential to the character of an attorney . . . ." *In re Disciplinary Action Against Graham*, 453 N.W.2d 313, 322 (Minn. 1990).

Applying the objective standard, the hearing panel concluded that "no reasonable lawyer would believe that Judge Brothers 'is corrupt and has been for some time.'"[63] We agree. The hearing panel heard ample evidence that Judge Brothers was widely regarded as an honest and capable judge. Mr. Gideon testified that Judge Brothers has an excellent reputation for truthfulness and veracity, and there was no truth to Mr. Manookian's allegations. Judge Gayden testified that Judge Brothers was not a corrupt judge. Mr. North testified that he practiced in front of Judge Brothers for decades and Judge Brothers had an "impeccable reputation for truth and veracity." Judge Brothers himself testified that the statements were offensive, defamatory, and unfounded.

Despite Mr. Manookian's assertion that retired Judge North told him Judge Brothers was corrupt, Mr. Manookian never produced his alleged recording of the conversation, Judge North did not testify, and the only evidence of any such conversation was testimony from Mr. Manookian, who was discredited by the hearing panel. Indeed, Mr. Manookian testified that his own experience with Judge Brothers was favorable: "My experience in Judge Brothers' court has always been that he is a very good judge. He's very thoughtful,

---

[63] In the alternative, the hearing panel found that even if the subjective standard were applied, it was satisfied. Citing *Ramsey*, the panel reasoned that Mr. Manookian published serious allegations against a sitting judge without any good-faith basis to do so. *See* 771 S.W.2d at 121. In light of our decision to apply the objective standard to this speech, we need not address the panel's alternative finding.

analytical. . . . He is a very good medical malpractice judge." The hearing panel's conclusion is well founded.

Under these circumstances, disciplining Mr. Manookian for violating Rule 8.2(a)(1) based on footnote 1 of the August 3, 2018 letter emailed to the *Shao* opposing counsel and other people, making false and salacious statements about Judge Brothers, does not violate the First Amendment.

RPC 1.9(c)

RPC 1.9(c) prohibits attorneys from revealing information relating to the representation of a former client or using such information to the disadvantage of the client.[64] Tenn. Sup. Ct. R. 8, RPC 1.9(c). Here, the hearing panel found, and the trial court affirmed, that Mr. Manookian violated Rule 1.9(c) by disclosing information about the lawsuit he filed on behalf of Mr. Gideon's son in Footnote 1 to the court pleading Mr. Manookian filed in *Shao* on September 5, 2017.

As noted in *Parrish*, court pleadings are considered in-court speech, the category in which the State's interest in regulating lawyers is at its highest. *See Parrish*, 560 S.W.3d 153; *Slavin*, 145 S.W.3d at 549. Further, as observed in *Abrams*, "[a] state's interest in regulating attorney speech is at its strongest when the regulation is necessary to preserve the integrity of the justice system or to protect clients." 488 P.3d at 1051. Here, the State's interest is in both—Mr. Manookian undermined the justice system by seeking unfair tactical advantage in *Shao* through the misuse of information relating to his representation of a former client.

Mr. Manookian maintains that, under the First Amendment, he cannot be disciplined for including Footnote 1 in his pleading because it accurately recites information that can be found in a public record and thus is "truthful."

---

[64] RPC 1.9(c) states:

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. Sup. Ct. R. 8, RPC 1.9(c).

As we have emphasized, the First Amendment would not shield Mr. Manookian from discipline under Rule 1.9(c) even if Footnote 1 were technically "truthful." As noted above, *Slavin* stressed that lawyer speech "need not be false" to justify disciplinary action. 145 S.W.3d at 549 (quoting *Waller*, 929 S.W.2d at 183 (holding that lawyer's in-court speech was not protected by the First Amendment)).

Here, truthful or not, Mr. Manookian revealed information relating to his representation of his former client, Mr. Gideon's son, and used that information to the disadvantage of his former client. The lawsuit in which Mr. Manookian represented Mr. Gideon's son involved a sensitive sexual matter. The hearing panel soundly rejected Mr. Manookian's explanation that he included Footnote 1 about Mr. Gideon's son in the pleading only to show that his "prior experience with Mr. Gideon's adult children [was] limited to having successfully represented his adult son . . ." Indeed, at the hearing, Mr. Manookian conceded that he interjected Mr. Gideon's son into *Shao* because he was angry at Mr. Gideon. The hearing panel found that Mr. Manookian weaponized the sensitive nature of the son's lawsuit in an attempt to coerce Mr. Gideon into standing down in *Shao*. The hearing panel's finding is well founded.

But regardless, Footnote 1 cannot be characterized as "truthful." The testimony before the hearing panel showed that Footnote 1 consisted of selected information from the filings in Mr. Gideon's son's lawsuit curated specifically to leave a false impression. Mr. Gideon testified to the hearing panel that Mr. Manookian's description in Footnote 1 was "written to make it look like my son was knowingly communicating with a guy for their joint mutual sexual satisfaction. That's not right. That's not accurate." The hearing panel credited Mr. Gideon's testimony that Footnote 1 was overall not truthful.[65]

---

[65] Mr. Manookian's reliance on *Hunter v. Va. State Bar ex rel. Third Dist. Comm.*, 744 S.E.2d 611 (Va. 2013) is unavailing. In *Hunter*, the Virginia court held that an attorney's blog reporting on public proceedings regarding his clients' cases was protected by the First Amendment, commenting, "To the extent that the information is aired in a public forum, privacy considerations must yield to First Amendment protections. In that respect, a lawyer is no more prohibited than any other citizen from reporting what transpired in the courtroom." *Id.* at 620. While the complaint in Mr. Gideon's son's case was filed in a public record, there was no proceeding in a courtroom and nothing "aired in a public forum." This goes to the exception in Tennessee's Rule 1.9(c)(3) (not contained in the rule at issue in *Hunter*) that allows a lawyer to reveal information that "has become generally known." Here, as discussed further below, the hearing panel made a factual finding that the information about Mr. Gideon's son's lawsuit was not "generally known," and that finding was supported by testimony in the record.

Moreover, the speech at issue in *Hunter* was commercial speech that was "not inherently misleading." *Id.* at 619. In contrast, in this matter, the hearing panel found that Mr. Manookian "mischaracterized Mr. Gideon's son and the underlying event" and that the purpose of Footnote 1 was "to embarrass Mr. Gideon and his son" to gain unfair tactical advantage in *Shao*.

In these circumstances, the State's interest in regulating the in-court attorney speech is at its zenith, to protect a client from abuse by his former lawyer for the personal benefit of the lawyer. Mr. Manookian's only interest in publicizing sensitive information about a former client, "to the disadvantage of the former client," was to secure unfair advantage by intimidating his opposing counsel in pending litigation. Tenn. Sup. Ct. R. 8, RPC 1.9(c). Mr. Manookian cites no case, and we have found none, where a lawyer's interest in publicizing sensitive information about a former client to the detriment of the client, to intimidate opposing counsel in a pending case, outweighed the State's interest in regulating such misconduct. Disciplining Mr. Manookian under Rule 1.9(c) does not infringe upon his First Amendment rights.

In sum, the First Amendment offers no shield to Mr. Manookian from discipline for the ethics violations in this appeal. As in *Gentile*, Mr. Manookian "as a citizen [cannot] be denied any of the common rights of citizens." 501 U.S. at 1074 (quoting *In re Cohen*, 166 N.E.2d 672, 675 (N.Y. 1960)). But he stands before this Court "in another quite different capacity, also. As a lawyer he was an officer of the court, and, like the court itself, an instrument of justice." *Id.* (quoting *In re Cohen*, 166 N.E.2d at 675) (cleaned up).

## C. Substantial and Material Evidence

Mr. Manookian next argues that the hearing panel erred in finding that his conduct violated the Rules of Professional Conduct. As noted above, we reverse or modify the hearing panel's decision if it is:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b).

Here, Mr. Manookian argues primarily that the hearing panel's factual findings are either arbitrary or capricious, or they are "unsupported by evidence which is both substantial and material," or both. *Id.* A hearing panel's decision is arbitrary or capricious if it is "not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Hughes v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 259 S.W.3d 631, 641 (Tenn. 2008). In applying the substantial and material evidence test, we determine whether the hearing panel's decision is "supported by such relevant evidence as a rational mind might accept to support a rational conclusion." *Beier v. Bd. of Pro. Resp.*

*of Sup. Ct. of Tenn.*, 610 S.W.3d 425, 438 (Tenn. 2020) (quoting *Bd. of Pro. Resp. v. Allison*, 284 S.W.3d 316, 322 (Tenn. 2009)).  We look at whether the record has a "reasonably sound factual basis" for the hearing panel's decision.  *Id.* (quoting *Hoover v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 395 S.W.3d 95, 103 (Tenn. 2012)).  A reasonably sound basis is less than a preponderance of the evidence "but 'more than a scintilla or glimmer.'"  *Id.* (quoting *Allison*, 284 S.W.3d at 322–23).  To the extent that the hearing panel's findings hinged on its assessment of the credibility of witnesses, credibility and the weight given to evidence are questions of fact.  Our standard of review requires us to give deference to the factual findings made by the hearing panel.  *Sitton*, 618 S.W.3d at 298 ("[T]he court shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact." (quoting Tenn. Sup. Ct. R. 9, § 33.1(b))).

As explained below, none of the hearing panel's findings on rule violations are either arbitrary or capricious, and all are supported by substantial and material evidence.

### 1.  Revealing Former Client Information

The hearing panel in this case found that Mr. Manookian violated Rule 1.9(c) by revealing information related to his representation of Mr. Gideon's son in Footnote 1 to response to Mr. Gideon's motion for sanctions.  Footnote 1 stated:

> Mr. Manookian's prior experience with Mr. Gideon's adult children is limited to having successfully represented his adult son in a matter involving Mr. Gideon's adult son exchanging sexually graphic emails with a much older man for the sexual gratification of the older man.

Ensuring that anyone reading Footnote 1 could find the sensitive client information referenced, the footnote included the heading of the case naming Mr. Gideon's son, the court in which the case was filed, the docket number, and the pleading, complete with specific page references.

Rule 1.9(c) generally proscribes revealing "information relating to the representation or us[ing] such information to the disadvantage" of a former client, but it contains an exception if the former client gives "informed consent, confirmed in writing" or if the information "has become generally known."[66]  Tenn. Sup. Ct. R. 8, RPC 1.9(c).

---

[66] RPC 1.9(c) states:

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these

We note at the outset that Mr. Manookian inasmuch as admitted that he violated Rule 1.9(c) by including Footnote 1 in his pleading.[67]  Nevertheless, we briefly address his arguments.

Mr. Manookian first argues that the record contains no evidence that his former client *did not* give informed consent.[68]  But in the hearing before the panel, Mr. Gideon testified without objection that his son did not know in advance that Mr. Manookian was going to disclose any information about the lawsuit, and the disclosure was without authorization. Mr. Manookian offered no evidence to the contrary.  The hearing panel credited Mr. Gideon's testimony, and it constitutes substantial and material evidence.

Mr. Manookian next argues the record does not contain substantial and material evidence that the information he revealed about Mr. Gideon's son was not "generally known."[69]  He argues it was generally known because it came from a public record, namely, a pleading filed with the Davidson County Circuit Court that was not under seal and was available through the court clerk's office.

---

Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. Sup. Ct. R. 8, RPC 1.9(c).

[67] Paragraph 16 of the Board's Supplemental Petition for Discipline states: "Mr. Manookian revealed information related to his representation of Mr. Gideon's son in an earlier lawsuit, without the son's permission, which was not generally known."  Mr. Manookian's response admitted the allegation, noting that he "was not aware at the time that the fact that information was a matter of public record was not sufficient to permit its further disclosure in other proceedings without running afoul of RPC 1.9," and claimed regret for "allowing himself to be goaded by Mr. Gideon."

Paragraph 19 of the Supplemental Petition for Discipline states: "[B]y revealing confidential information to the disadvantage of his former client, Mr. Gideon's son, in his Response to Clarence Gideon's Motion for Sanctions, Mr. Manookian violated Rule of Professional Conduct 1.9(c)."  Mr. Manookian denied his use of the information "actually disadvantaged his former client" and reiterated that he "did not realize at the time that an attorney could violate RPC 1.9 by further disclosing information that was already a matter of public record."

At the disciplinary hearing, Mr. Manookian made an oral motion to amend his answer.  The panel denied the oral motion but said it would allow him to present law or argument for further review.  Mr. Manookian did not follow up.

[68] For purposes of this appeal, we will assume that the burden of proof was not on Mr. Manookian to prove the exception, consent in writing by the former client.

[69] Again, for purposes of this appeal, we will assume that the burden was not on Mr. Manookian to prove the exception, that the information he revealed was "generally known."

In the hearing, Mr. Gideon testified that his son's lawsuit settled in 2008 or 2009, did not get publicity while it was pending, and never became generally known in the community. Judge Brothers, a Davidson County Circuit Court Judge for thirty years, testified that he was not aware of the lawsuit until Mr. Manookian revealed it in the *Shao* pleading.[70] That Mr. Manookian included in Footnote 1 detailed information on how to find the referenced pleading indicates he understood that most anyone reading Footnote 1, outside of the target, Mr. Gideon, would not be familiar with the matter.

We agree with the hearing panel that information that is publicly available is not necessarily "generally known."[71] The exception in Rule 1.9(c) is not intended to let lawyers reveal information relating to a former representation to the detriment of the former client simply because "a diligent researcher could unearth it through public sources." *In re Anonymous*, 932 N.E.2d 671, 674 (Ind. 2010). As a New Jersey federal district court explained: "'Generally known' does not only mean that the information is of public record. . . . The information must be within the basic understanding and knowledge of the public. The content of form pleadings, interrogatories and other discovery materials . . . does not make that information 'generally known' within the meaning of Rule 1.9(c)." *Pallon v. Roggio*, No. CIV.A.04-3625(JAP), 06-1068(FLW), 2006 WL 2466854, at *7 (D.N.J. Aug. 24, 2006).

Further, Comment 8a to RPC 1.9(c) explains, "A lawyer may not . . . justify adverse use or disclosure of client information simply because the information has become known to third persons . . . . Even if permitted to disclose information relating to a former client's representation, a lawyer should not do so unnecessarily." Tenn. Sup. Ct. R. 8, RPC 1.9(c), cmt. 8a. The hearing panel found that the improper disclosure mischaracterized Mr.

---

[70] Mr. Manookian acknowledges the witnesses' testimony but dismisses it because none of them conducted a poll on the public's general knowledge of Mr. Gideon's son's lawsuit. This argument is without merit.

[71] The hearing panel was guided by ABA Formal Opinion 149, which states:

Unless information has become widely recognized by the public (for example by having achieved public notoriety), or within the former client's industry, profession, or trade, the fact that the information may have been discussed in open court, or may be available in court records, in public libraries, or in other public repositories does not, standing alone, mean that the information is generally known for Model Rule 1.9(c)(1) purposes. Information that is publicly available is not necessarily generally known. Certainly, if information is publicly available but requires specialized knowledge or expertise to locate, it is not generally known within the meaning of Model Rule 1.9(c)(1).

20, *ABA Formal Opinion* 149.

Gideon's son and the underlying event, and that none of the events made it necessary for Mr. Manookian to provide specific information about the case where he represented Mr. Gideon's son.[72]

The hearing panel found that Mr. Manookian knowingly revealed, mischaracterized, and used information related to his former representation of Mr. Gideon's son to embarrass and intimidate Mr. Gideon, with the potential for serious disadvantage of his former client in violation of RPC 1.9(c). The hearing panel's findings are neither arbitrary nor capricious and are supported by substantial and material evidence.

## 2. *False Statement About Integrity of a Judge*

The hearing panel found that Mr. Manookian made false statements about Judge Brothers's integrity in footnote 1 of his August 3, 2018 letter to opposing counsel Mr. North and other persons, reciting a purported conversation with Mr. North's brother Judge North, and that Mr. Manookian made the statements with reckless disregard for their truth or falsity.[73] The panel found that this violated RPC 8.2(a)(1).[74]

---

[72] Mr. Manookian argues that the hearing panel erred in ruling that Mr. Manookian's disclosure about his former client violated RPC 4.4(a)(1) and 8.4(a) and (d). He alleges the hearing panel based its holding as to these violations on its finding that the footnote "had the potential for serious injury to his former client." However, the potential for serious injury to Mr. Manookian's client was discussed in connection with the hearing panel's finding that Mr. Manookian violated RPC 1.9(c), which refers to revealing or using client information to the disadvantage of the former client.

[73] Footnote 1 to the August 3, 2018 letter stated:

Preliminary to lengthier phone call conducted at the gratuitous request of Retired Davidson County Circuit Court Judge Steve North, wherein Ret. Judge North states and opines upon personal knowledge, having served on the bench with Judge Tom Brothers and being the brother of Phillip North, that: Judge Tom Brothers is "corrupt" and has been for some time, that Judge Tom Brothers' "corruption" arises out of his financial needs; that Judge Tom Brothers' "corruption" has long resulted, and continues to result, in preferable, "corrupt" treatment for certain Nashville-based companies, which benefit from consistent, "corrupt" favorable rulings in Judge Brothers' courtroom, to the exclusion of justice; that such "corruption" has, and continues to, materially benefit, among others, C.J. Gideon and his firm, in his representation of certain "corrupt" clients; as well as lengthy disclosure and dissertation on Phillip North, all of which is material to the supposed grievances in Phillip North's "Motion for Third Round of Sanctions."

[74] RPC 8.2(a)(1) states "A lawyer shall not make a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of the following persons: (1) a judge[.]" Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1).

Mr. Manookian argues that, as a matter of law, there is not substantial and material evidence that he was reckless because footnote 1 to the August 3 letter only recounted what retired Judge Steve North said about Judge Brothers.[75]

As recounted above, the hearing panel found that the essential message Mr. Manookian intended to convey in footnote 1 was not simply retired Judge North's purported opinion; it was that Judge Brothers is in fact corrupt, and the hearing panel found that this intended message was false. Applying the objective standard adopted above, the hearing panel concluded that no reasonable lawyer would believe that Judge Brothers is corrupt, so Mr. Manookian's assertion was made with reckless disregard. These findings are supported by ample testimony, outlined above, that was credited by the hearing panel.[76] Thus, the hearing panel's finding that Mr. Manookian violated RPC 8.2(a)(1) is supported by substantial and material evidence.

### 3. *No Substantial Purpose Other Than to Embarrass, Delay, or Burden*

The hearing panel found that, in the course of representing his client in *Shao*, Mr. Manookian repeatedly used "means that have no substantial purpose other than to embarrass, delay, or burden a third person," in violation of RPC 4.4(a)(1).[77] The incidents found to violate this provision included: (1) Mr. Manookian's August 19, 2017 email sent to opposing counsel Mr. Gideon regarding his daughter; (2) his March 30, 2018 email sent to opposing counsel Mr. North and others insinuating that a judge had an unfavorable opinion of Mr. North; (3) his August 3, 2018 email and attached letter sent to opposing counsel Mr. North and others accusing Judge Brothers of corruption; and (4) his August 4, 2018 email sent to opposing counsel Mr. North and others with detailed personal information and distortions about Mr. North and his family.

---

[75] Mr. Manookian presented no proof that he had such a conversation with retired Judge Steve North except his own testimony. The hearing panel, however, deemed the entirety of Mr. Manookian's testimony not credible. Faced with the hearing panel's decision not to credit his testimony, Mr. Manookian now argues that the Board was obliged to call retired Judge North as a witness. This argument is without merit.

[76] As described in more detail above, Judge Brothers testified that the assertions in footnote 1 were false and unfounded, Mr. Gideon attested as to Judge Brothers's reputation for truth and veracity, Mr. Phillip North testified that his experience was that Judge Brothers was an upstanding judge, and Judge Gayden testified that Judge Brothers is not corrupt.

[77] In relevant part, RPC 4.4(a)(1) states: "(a) In representing a client, a lawyer shall not: (1) use means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ." Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1).

Mr. Manookian first argues there is not substantial and material evidence to support the hearing panel's finding that his August 19, 2017 email to Mr. Gideon regarding Mr. Gideon's daughter was made "in the representation of a client," so his statements in that email did not violate RPC 4.4(a)(1). He contends that the email was not made in response to Mr. Gideon's discovery deficiency letter in *Shao*, but was instead sent for personal reasons, to convey his friendly willingness to help Mr. Gideon's daughter in her employment.

The hearing panel observed that, between 2011 and 2017, Mr. Manookian and Mr. Gideon did not speak, socialize, or interact with each other.[78] Mr. Manookian sent the August 19 email from his law firm email address with his firm signature at the bottom, and he sent it to Mr. Gideon's law firm email, only a couple of days after Mr. Gideon sent his letter in *Shao* detailing significant deficiencies in Mr. Manookian's discovery responses. Mr. Manookian claimed he had not seen Mr. Gideon's letter when he sent the August 19 email and that the timing of his email was mere coincidence.

Reviewing all of this evidence and considering its finding that Mr. Manookian's testimony was not credible, the hearing panel found that, when Mr. Manookian sent the August 19 email, "Mr. Manookian was representing the plaintiff in the *Shao* case and he knew that Mr. Gideon was representing one of the defendants in the *Shao* case. The email was sent to opposing counsel in the *Shao* case at a time when discovery objections were at issue and being discussed." The hearing panel also noted that Mr. Manookian attached the same email, in unredacted form, to his response to Mr. Gideon's motion in *Shao* for sanctions, thus removing any doubt as to whether the August 19 email should be considered part of Mr. Manookian's representation in *Shao*. We find substantial and material evidence in the record to support the finding that Mr. Manookian sent the August 19 email in the course of representing his client in *Shao*.

The hearing panel found that Mr. Manookian's email to Mr. Gideon about his daughter "served no substantial purpose other than to threaten, intimidate, demean, embarrass, harass and distract" Mr. Gideon in the *Shao* litigation and that it "[was] intended to, and did, distract opposing counsel and the judge from the underlying case." It noted again that Mr. Manookian and Mr. Gideon had no contact with one another for several years after Mr. Manookian left the law firm, yet Mr. Manookian sent his email shortly after Mr. Gideon was retained in *Shao* and sent a letter criticizing Mr. Manookian's discovery responses.[79] The hearing panel's finding that this email served no purpose other than to

[78] Earlier in the same month Mr. Gideon was substituted as counsel in *Shao*, he was subpoenaed to testify in a Texas lawsuit in which Mr. Manookian was a party.

[79] Undermining his claim of friendly intent behind the email, Mr. Manookian acknowledged he was offended by Mr. Gideon's testimony in the Texas proceedings against Mr. Manookian, given shortly before Mr. Gideon became involved in the *Shao* litigation.

threaten, embarrass, delay, and burden Mr. Gideon is supported by substantial and material evidence in the record.

Mr. Manookian next argues there is not substantial and material evidence that his March 30 email to opposing counsel Mr. North constituted "means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ." Tenn. Sup. Ct. R. 8, RPC 4.4(a)(1). He claimed he sent the March 30 email to inform other counsel in *Shao* that he intended to present Judge Gayden's affidavit testimony about Judge Brothers's purported bias against Mr. Manookian. The hearing panel, however, focused on Mr. Manookian's gratuitous assertions implying that Judge Gayden harbored unfavorable opinions about Mr. North, which had never come up. Despite any nominal purpose for the rest of the email, this part of it served no legitimate or substantial purpose on behalf of Mr. Manookian's client, and there is substantial and material evidence to support the finding that its sole purpose was to embarrass, delay, or burden Mr. North.

Mr. Manookian argues that the remainder of the emails found to violate Rule 4.4(a)(1) had legitimate purposes.[80] The hearing panel found that Mr. Manookian's explanations were not supported by credible evidence and did not square with the evidence credited by the hearing panel.

For example, Mr. Manookian testified he sent the August 3, 2018 emailed letter, recounting a purported conversation with retired Judge North about Judge Brothers's alleged corruption, in response to Mr. North's sanctions motion and as notice he would file the recording of retired Judge Steve North because the sanctions motion questioned his efforts to disqualify Judge Brothers. He claimed he included footnote 1 in the letter, accusing Judge Brothers of corruption, to counter accusations in the sanctions motions that his efforts to disqualify Judge Brothers were inappropriate. The hearing panel rejected this explanation, noting that Mr. North's motion did not seek sanctions against Mr. Manookian for his efforts to disqualify Judge Brothers, and at any rate Judge Brothers transferred the case four months before Mr. Manookian's letter. The hearing panel concluded that the emailed letter served no legitimate purpose other than to embarrass Judge Brothers and

---

[80] Mr. Manookian argues that his June 7, 2018 email with insulting language to Mr. North served the purpose of offering to provide materials to Mr. North without the necessity of a motion or hearing, and that his June 22, 2018 email to Mr. North facially recorded his concern that Mr. North was certifying service of documents but actually withholding service of them. Although the hearing panel stated that those emails also "served no substantial purpose other than to threaten, intimidate, demean, embarrass, harass and distract opposing counsel in the *Shao* case," it noted that its Rule 4.4(a)(1) analysis was "focused on and was principally concerned with" only four emails: (1) the August 19, 2017 email; (2) the March 30, 2018 email; (3) the August 3, 2018 email and attached letter; and (4) the August 4, 2018 email. Consequently, we also focus our Rule 4.4(a)(1) analysis on those emails.

recklessly attack his integrity. The hearing panel also observed that while Mr. Manookian claimed the email sought to confirm that it was retired Judge North who had called him before he repeated the salacious details, Mr. Manookian went ahead with no confirmation and circulated his August 3, 2018 letter to Mr. North, Mr. Gideon, and eighteen other people.

Mr. Manookian claimed his August 4, 2018 email to Mr. North served the purpose of showing that Mr. North had been receiving and opening Mr. Manookian's emails but not responding to them. The hearing panel rejected this explanation, noting that the August 4, 2018 email to Mr. North contained a slew of personal information Mr. Manookian had unearthed about Mr. North and his wife, complete with distorted and unsupported unflattering inferences. Mr. Manookian admitted he included information about Mr. North having obtained property from his parents and an accusation that Mr. North left his previous wife for his current wife all for the purpose of embarrassing Mr. North. He conceded that he put much of the information in the August 4 email because of his "frustration at that time in the *Shao* case." Mr. North described the email as threatening and offensive, an attempt to embarrass him, his wife, and his family. He said the email was greatly embarrassing to him and put a lot of emotional stress on his wife.

Most important, as to all of the communications at issue for RPC 4.4(a)(1), Mr. Manookian's claims of legitimate purposes for them were based on explanations in his own testimony.[81] Put simply, the hearing panel did not believe Mr. Manookian's testimony. It found that the emails "served no substantial purpose other than to threaten, intimidate, demean, embarrass, harass and distract opposing counsel in the *Shao* case pending in the Circuit Court for Davidson County," and that none served to advocate for Mr. Manookian's client or advance the litigation. The hearing panel's findings on violations of RPC 4.4(a)(1) are not arbitrary or capricious and they are supported by substantial and material evidence in the record.

### 4. *Conduct Prejudicial to the Administration of Justice*

---

[81] An attorney cannot escape responsibility for a violation of Rule 4.4(a)(1) by claiming a legitimate purpose if an objective evaluation of the conduct would lead a reasonable person to conclude otherwise. *See In re Comfort*, 159 P.3d at 1020; *In re Pyle*, 91 P.3d 1222, 1229 (Kan. 2004) (attorney's letter to opposing counsel violated RPC 4.4). "A lawyer's obligation of zealous representation should not and cannot be transformed into a vehicle intent upon harassment and intimidation." *Fla. Bar v. Buckle*, 771 So. 2d 1131, 1134 (Fla. 2000); *Matter of Disciplinary Action Against Mertz*, 712 N.W.2d 849, 853–54 (N.D. 2006) (legitimate purpose for attorney's communication does not shield attorney from discipline for insulting, degrading, embarrassing remarks contained within the communication).

The hearing panel found that all of the communications by Mr. Manookian at issue in this appeal constituted conduct that is prejudicial to the administration of justice.[82] Consequently, all of the conduct violated RPC 8.4(a) and (d).[83]

The hearing panel found:

> The emails sent by Mr. Manookian to opposing counsel and others violated RPC 8.4(d) because they were prejudicial to the administration of justice. They were intended to, and did, distract opposing counsel and the judge from the underlying case. Judge Brothers testified that he finally recused himself from the *Shao* case, nonetheless, because of repeated efforts by Mr. Manookian to continually interject either problems with counsel or the Court.

In *Slavin*, this Court held that similar gratuitous disparaging remarks about another lawyer is conduct that is prejudicial to the administration of justice, in violation of RPC 8.4(d). 145 S.W.3d at 549. Substantial and material evidence supports the hearing panel's conclusion that Mr. Manookian's conduct does as well.

Additionally, as explained above, substantial and material evidence supports the hearing panel's findings that Mr. Manookian violated RPC 1.9(c), 4.4(a)(1), 8.2(a)(1), and 8.4(d). This same evidence supports the hearing panel's finding that he violated RPC 8.4(a) as well. Thus, the proof supports the hearing panel's finding that Mr. Manookian violated RPC 8.4(a) and (d).

In sum, as to each of the rule violations found by the hearing panel, none were either arbitrary or capricious, and all were supported by substantial and material evidence.

## II. <u>Section 33.1 and the Trial Court</u>

---

[82] The violations of RPC 8.4(a) and (d) include: (1) the August 19, 2017 email to Mr. Gideon about his daughter's employment; (2) the September 5, 2017 court document that included client information about Mr. Gideon's son; (3) the March 30, 2018 email to Mr. North implying a judge had a low opinion of him; (4) the June 7, 2018 email to Mr. North with insulting language; (5) the June 22, 2018 email to Mr. North accusing him of dishonesty; (6) the August 3, 2018 emailed letter to Mr. North about an alleged phone call with Mr. North's brother and Judge Brothers's alleged corruption; and (7) the August 4, 2018, email to Mr. North inserting detailed personal information about Mr. North and his family.

[83] RPC 8.4(a) and (d) provide "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . (d) engage in conduct that is prejudicial to the administration of justice." Tenn. Sup. Ct. R. 8, RPC 8.4(a), (d).

After the hearing panel issued its decision, Mr. Manookian filed a petition for review with the trial court. In his petition, Mr. Manookian argued that the sanction recommended by the hearing panel was too harsh. The Board did not file a separate petition for review, but in its brief to the trial court, the Board argued that the hearing panel's decision to impose suspension instead of disbarment was arbitrary and capricious and that Mr. Manookian should be disbarred. The trial court held that the Board could respond to Mr. Manookian's argument that the recommended sanction was too harsh. But it also held that the Board forfeited its right to ask the trial court to increase the sanction by not filing its own petition for review, citing section 33.1 of Rule 9 of the Rules of the Supreme Court of Tennessee. In this appeal, the Board contends that the trial court erred. It contends that, regardless of whether the Board filed its own petition for review, the trial court should have let it argue for an increase in discipline. This is an issue of first impression.

Appeals in lawyer disciplinary proceedings are governed by Rule 9, section 33.1, which provides:

> (a) The respondent or petitioning attorney or the Board may appeal the judgment of a hearing panel by filing . . . a Petition for Review in the circuit or chancery court . . . .

> (b) The review shall be on the transcript of the evidence before the hearing panel and its findings and judgment. . . . The court may affirm the decision of the hearing panel or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: . . . (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion . . . .

Tenn. Sup. Ct. R. 9, § 33.1(a) and (b).

In comparison, under our Rules of Appellate Procedure, cross appeals are not required and parties can raise issues on appeal even if they did not file their own appeal. *See* Tenn. R. App. P. 3(h) ("[C]ross appeals and separate appeals are not required. Consequently, upon the filing of a single notice of appeal in a civil case, issues may be brought up for review and relief pursuant to these rules by any party."). *See also* Tenn. R. App. P. 13(a) ("[A]ny question of law may be brought up for review and relief by any party. Cross-appeals, separate appeals, and separate applications for permission to appeal are not required.").

The Board argues the trial court should have let it do the same. It contends that the language of Section 33.1 is ambiguous about whether each party must file a petition for review and can be interpreted to permit any party to bring up issues on appeal, regardless of whether the party filed a petition for review.[84] An interpretation of Rule 33.1 that precludes the Board from raising issues unless it filed its own petition for review, it cautions, will force the Board to file petitions for review in all disciplinary cases, to avoid a situation where the attorney files a last-minute petition for review and the Board is left unable to raise any issues on appeal.

Section 33.1(d) specifies which of our Rules of Appellate Procedure apply to petitions to review hearing panel disciplinary decisions. *See* Tenn. Sup. Ct. R. 9, § 33.1(d) ("Except as otherwise provided in this Rule, Tenn. R. App. P. 24, 25, 26, 27, 28, 29 and 30 shall apply to such appeals to this Court."). The list of Rules of Appellate Procedure imported into such appeals does not include either Rule 3(h) or Rule 13(a), which eliminate the need for cross appeals in civil appeals. Thus, we are left only with the language of section 33.1 of Rule 9 of the Supreme Court Rules, which outlines the authority of trial courts to hear petitions to review hearing panel judgments.

"Interpretation of a rule of the Tennessee Supreme Court is a question of law, which we review de novo." *Hornbeck v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 545 S.W.3d 386, 395 (Tenn. 2018). Section 33.1 says that the trial court "may affirm the decision of the hearing panel or remand the case for further proceedings." Tenn. Sup. Ct. R. 9, § 33.1(b). It provides further that the trial court "may reverse or modify the decision *if the rights of the party filing the Petition for Review* have been prejudiced . . . ." *Id.* (emphasis added). Thus, section 33.1 only authorizes trial courts to reverse or modify a hearing panel's decision if the rights of the party "filing the Petition for Review" have been prejudiced. It contains no language authorizing trial courts to reverse or modify the hearing panel's decision for a party who did not file a Petition for Review. The authority for the trial court urged by the Board is not in section 33.1.

The Board makes a valid point that this interpretation of section 33.1 may force the Board to file a defensive petition for review in every disciplinary case, to avoid being precluded from raising its own issues if an attorney files a late-night petition for review on the last day. This may be a good policy reason to amend section 33.1 to eliminate cross-appeals, as with other civil appeals. But the language in section 33.1 when the trial court

---

[84] In support, the Board cites *In re: Charles Edward Walker*, BPR #021277, No. M2021-00289-SC-BAR-BP (Tenn. Apr. 1, 2021), in which the attorney filed his notice of appeal in the Court of Appeals instead of in the Supreme Court. The Court in that case applied Tennessee Rule of Appellate Procedure 17 and transferred the appeal to this Court. This case does not involve the transfer of an appeal. Respectfully, we find *Walker* inapposite.

heard this appeal did not authorize the trial court to increase the discipline as the Board wanted, because the Board did not file its own petition for review.

The trial court did not err in holding it lacked authority under Rule 9, section 33.1 to consider the Board's argument that Mr. Manookian should be disbarred because of the hearing panel's misapplication of the ABA Standards.

### III.     Appropriateness of Sanction

We look next at whether the discipline imposed by the hearing panel is too harsh or too lenient. In an issue of first impression, Mr. Manookian argues that, under Rule 9, section 33.1, the Board's failure to file its own separate petition for review to the trial court precludes this Court from considering whether to increase the sanction to disbarment.[85] It does not. The reference in Section 33.1(a) to whether rights of a party filing a petition for review have been prejudiced goes to the trial court's authority to grant relief; it does not limit this Court's authority. Addressing appeals to the Supreme Court, Tennessee Supreme Court Rule 9, section 33.1(d) simply states, "Either party dissatisfied with the decree of the circuit or chancery court may prosecute an appeal directly to the Court." Tenn. Sup. Ct. R. 9, § 33.1(d). No language in Rule 9, section 33.1 constrains this Court's ability to grant relief to either party. Indeed, even if no appeal from the hearing panel's decision had been filed, this Court could review the propriety of the sanction under Tennessee Supreme Court Rule 9, section 15.4(b)–(e).

Similarly, the reference in Section 33.1(a) to whether rights of a party filing a petition for review have been prejudiced does not address whether an issue was preserved on appeal. It goes only to the trial court's authority to grant relief. Here, the Board preserved the issue of whether the sanction for Mr. Manookian should be increased by raising it to the trial court and again in its brief to this Court. *See Walwyn v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 481 S.W.3d 151, 171 (Tenn. 2015) ("It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court." (quoting *Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010))).

---

[85] Mr. Manookian also argues that this Court lacks subject matter jurisdiction to consider an increase in sanction because the Board did not file its own petition for review in the trial court. In support, he cites *Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 868 n.1 (Tenn. Ct. App. 2008) and *Smith v. State*, No. M2012-00844-COA-R3-CV, 2012 WL 3100595, at *1 (Tenn. Ct. App. July 30, 2012). These cases are inapposite. In both, the matters at issue involved prior orders that were not appealed by either party. Moreover, neither involved attorney discipline or the jurisdiction of this Court in matters involving attorney discipline. In this case, Mr. Manookian timely appealed to the trial court, and from there "[e]ither party dissatisfied with the decree of the circuit or chancery court may prosecute an appeal directly to this Court." Tenn. Sup. Ct. R. 9, § 33.1(d). Both parties have appealed to this Court and both challenge the sanction imposed by the hearing panel. This argument is without merit.

Most important, this Court has inherent authority under the Tennessee Constitution to review all attorney discipline. Under Tennessee's Constitution, the powers of government are "divided into three distinct departments: the Legislative, Executive, and Judicial." Tenn. Const. art. II, § 1. The Tennessee Constitution states that "[t]he judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish; in the Judges thereof, and in Justices of the Peace." Tenn. Const. art. VI, § 1. As "a direct creature of the Constitution," the Tennessee Supreme Court "constitutes the supreme judicial tribunal of the [S]tate." *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976); *see also In re Bell*, 344 S.W.3d 304, 313 (Tenn. 2011). "This Court has broad authority over the Tennessee Judicial Department." *Moore-Pennoyer v. State*, 515 S.W.3d 271, 276 (Tenn. 2017) (citing *In re Bell*, 344 S.W.3d at 313; *Belmont v. Bd. of L. Exam'rs*, 511 S.W.2d 461, 463 (Tenn. 1974)).

Tennessee's General Assembly "has acknowledged this Court's 'broad conference of full, plenary and discretionary power,' and its 'general supervisory control over all the inferior courts of the [S]tate,'" *Id.* (citing Tenn. Code Ann. §§ 16-3-504 and 16-3-501 (2009)). The General Assembly has explicitly recognized that this Court's powers are not a matter of legislative grace; they derive from "the common law as it existed at the time of the adoption of the constitution of Tennessee and of the power inherent in a court of last resort." *Id.* (citing Tenn. Code Ann. § 16-3-503).

This Court's inherent power under the Tennessee Constitution includes the authority to regulate and supervise the practice of law in this State. *See, e.g.*, *In re Sitton*, 618 S.W.3d at 294; *Dunlap v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 595 S.W.3d 593, 606 (Tenn. 2020); *Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 891 (Tenn. 2010); *Petition of Burson*, 909 S.W.2d 768, 774 (Tenn. 1995); *see also Ex parte Garland*, 71 U.S. 333, 378–79 (1866) (admission and exclusion of lawyers is a function of the judicial power held by the state supreme courts). This authority carries responsibility for "promulgating and enforcing the rules that govern the legal profession as part of [our] duty to regulate the practice of law in this state." *In re Sitton*, 618 S.W.3d at 294 (quoting *Bd. of Pro. Resp. v. MacDonald*, 595 S.W.3d 170, 181 (Tenn. 2020)).

If this Court has the inherent and original power to prescribe the ethics rules governing the practice of law, "then this Court has the original power to review" the actions of the hearing panel "in interpreting and applying them." *Belmont*, 511 S.W.2d at 462 (citing *In re: Adoption of Rule of Ct.*, 479 S.W.2d 225 (Tenn. 1972)). "This Court's power, then, in this respect is original, rather than appellate." *Petition for Rule of Court Activating, Integrating and Unifying the State Bar of Tenn.*, 282 S.W.2d 782, 784 (Tenn. 1955).

Thus, "[u]nder our inherent authority in the Tennessee Constitution, we review all attorney disciplinary judgments." *In re Sitton*, 618 S.W.3d at 294. We review "attorney disciplinary appeals . . . to ensure that these rules are enforced in a manner that preserves both the integrity of the bar and the public trust in our system of justice." *Green v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 567 S.W.3d 700, 713 (Tenn. 2019) (citing *Hughes*, 259 S.W.3d at 647). Consequently, the Board's failure to file its own separate petition for review with the trial court does not limit our authority, or our responsibility, to review the sanction imposed on Mr. Manookian.[86]

---

[86] The dissent offers a due process defense on behalf of Mr. Manookian, arguing the Court "dispense[s] with notice and an opportunity to be heard" on disbarment. Untrue. Throughout the disciplinary proceedings, Mr. Manookian has been on notice that he was subject to disbarment.

Even before Mr. Manookian's hearing to the hearing panel, the Board's brief took the position that disbarment was appropriate for his misconduct. The hearing panel found disbarment was the presumptive sanction. After Mr. Manookian appealed to the trial court, the Board asked the trial court to disbar him. Mr. Manookian's briefs to the trial court acknowledged the Board was seeking to disbar him and argued vigorously against it. Mr. Manookian's counsel told the trial court the Board was trying to disbar Mr. Manookian. The trial court would have granted the Board's request to disbar Mr. Manookian had the Board filed its own separate petition for review.

Before this Court, both parties filed notices of appeal; the Board filed its notice first and was designated the appellant. Mr. Manookian, designated the appellee, did not hire counsel for the appeal to this Court; instead, he represented himself. In its initial brief, the Board asked this Court to disbar Mr. Manookian. After obtaining a substantial extension of time to respond, Mr. Manookian's response brief acknowledged: "It is, of course, no secret that Disciplinary Counsel desires disbarment of the Appellee[.]" Still, he chose not to address the merits of why he should not be disbarred. The Board's reply brief again asked for disbarment. Mr. Manookian's reply said he would stand on his prior brief and did not address the merits of why he should not be disbarred.

Indeed, instead of responding to the Board's argument that his conduct justifies disbarment, Mr. Manookian made the novel argument (ultimately unsuccessful) that the Board's failure to file its own separate petition for review with the trial court precluded this Court from even considering disbarment. The *entire point* of this argument was to erect a technical procedural barrier to having this Court consider disbarment on its merits. Mr. Manookian knew that, absent success on his novel procedural argument, he was staring down the barrel of disbarment.

Though the dissent acknowledges this Court's authority, it argues we should have created a new procedure special for this case by following the process set out in Tennessee Supreme Court Rule 9, Section 15.4. But the plain language of Section 15.4 makes it inapplicable; Section 15.4 sets out the procedure for Court review of discipline when *no* party files an appeal. *See* Tenn. Sup. Ct. R. 9, § 15.4. In this case, *both* parties filed an appeal to this Court, so this argument makes no sense.

In this appeal, we simply address the issues raised by both parties, including the Board's request that we disbar Mr. Manookian. That is an everyday, unremarkable occurrence; hardly a "workaround." Mr. Manookian even told this Court it was "no secret" the Board was asking for disbarment. The dissent acknowledges the Board "argued for disbarment before the hearing panel, the trial court, and this Court,"

- 66 -

but contends due process required this Court to tell Mr. Manookian, "we will consider the issues raised by both parties." It did not.

In addition to its unfounded due process defense, the dissent gratuitously swipes at the BPR and mischaracterizes its statements. It first criticizes the Board's failure to file a separate petition for review with the trial court, though never before has a lawyer argued that the Board's failure to file its own petition for review in the trial court limits this Court's authority over appeals. The dissent then distorts the Board's explanation of its reasoning, repeatedly referring to the Board as "satisfied" with suspension. As Board counsel explained, after the hearing panel recommended suspension instead of disbarment, "the Board has to parse its resources," so the BPR elected not to appeal the suspension unless Mr. Manookian appealed. Once he did, the BPR continued to seek disbarment on appeal.

Importantly, the dissent omits crucial context for the Board's decisions, namely, Mr. Manookian generated a heap of disciplinary complaints that required significant BPR resources. We mention above several serious disciplinary complaints against Mr. Manookian that warranted orders by this Court; these are *not* at issue in this appeal but still required BPR investigation and prosecution. But there were even more serious complaints against Mr. Manookian in the pipeline that demanded BPR action. In one, for example, the property manager for Mr. Manookian's trashed and apparently abandoned rental home notified him she had stored his belongings left in the house and would return them to him. Aware that the manager was in a child custody dispute, Mr. Manookian responded by telling her in a recorded conversation:

> You're guilty of felony theft, and you're gonna to go to f[]ing jail, and it's gonna have a major effect on your custody issues . . . Do you know who you're f[]ing with, A[]? . . . I'm gonna ruin your f[]ing life. Do you know who I am? . . . When we get off the phone, you need to Google my name . . . Do you know what I do to people who do way less than this to me? . . . Where's your daughter? . . . I'm gonna find out where you are right now . . . . I'm gonna figure out who your dad is, what hospital he's in. You know what I do for a living? I sue hospitals . . . . You're never gonna see your kid again.

Testifying later against the property manager in her custody proceedings, Mr. Manookian swore under oath he never made any threats. These complaints are not part of the sanction underlying this appeal; however, they were mentioned in this record and provide a window into how many serious complaints against Mr. Manookian the BPR was juggling.

As the dissent is aware, by order of this Court, Mr. Manookian's temporary suspension was coupled with a directive from the Court that the Board resolve the disciplinary complaints against Mr. Manookian expeditiously. This bears out the BPR's choice on how best to allocate its limited resources and not initiate an appeal of the hearing panel's recommendation of suspension in this case, in light of other disciplinary complaints seeking disbarment and this Court's mandate to wind up the disciplinary proceedings expeditiously. This important context is not included by the dissent in its gratuitous criticism of the BPR.

In sum, the dissent is misguided. This "record is replete with numerous proceedings and forums in which [Mr. Manookian] was afforded a full opportunity to be heard." *In re Cook*, 551 F.3d 542, 553 (6th Cir. 2009) (holding that the federal court was not permitted to review the adequacy of the state disbarment proceedings, but only whether alleged defects in the state proceedings tainted the federal disbarment proceedings). Mr. Manookian has known good and well throughout these proceedings he was facing disbarment by this Court. He received ample notice and opportunity to be heard.

We consider, then, whether the sanction imposed by the hearing panel is too harsh or too lenient.

## A. Presumptive Sanction

To determine the proper discipline, the Court looks first to the ABA Standards. *In re Sitton*, 618 S.W.3d at 298 (citing *In re Vogel*, 482 S.W.3d 520, 533 (Tenn. 2016)); Tenn. Sup. Ct. R. 9, § 15.4(a) ("In determining the appropriate type of discipline, the hearing panel shall consider the applicable provisions of the ABA Standards for Imposing Lawyer Sanctions.")). The ABA Standards are guidelines for determining the appropriate discipline. *In re Sitton*, 618 S.W.3d at 301. They "recommend the type of sanction—such as disbarment or suspension—that the ABA Sanctions Committee deems generally appropriate for various kinds of misconduct." *Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Cowan*, 388 S.W.3d 264, 268 (Tenn. 2012) (emphasis omitted).

For Mr. Manookian's violations of RPC 4.4, RPC 8.2, and RPC 8.4(d), the hearing panel looked to the ABA Standards governing a lawyer's violation of his duty to the legal system. It concluded that ABA Standard 6.21 was the appropriate baseline sanction:

> 6.0 Violations of Duties Owed to the Legal System
> . . . .
> 6.2 Abuse of the Legal Process
> . . . .
> 6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

ABA Standard 6.21. The hearing panel noted that the commentary to ABA Standard 6.2 adds: "Lawyers should be disbarred for intentionally misusing the judicial process to benefit the lawyer or another when the lawyer's conduct causes injury or potentially serious injury to a party, or serious or potentially serious interference with a legal proceeding."

For Mr. Manookian's violation of RPC 1.9(c), the hearing panel found that ABA Standard 4.21[87] was applicable:

> 4.2 Failure to Preserve the Client's Confidences
> . . . .

---

[87] *See supra* note 44.

4.21 Disbarment is generally appropriate when a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.

ABA Standard 4.21. Here, Mr. Manookian knowingly used information relating to his representation of Mr. Gideon's son with intent to gain tactical benefit against opposing counsel Mr. Gideon in the *Shao* litigation. The hearing panel recited commentary to this ABA Standard stating that disbarment is appropriate when a lawyer: "knowingly uses information relating to representation of a former client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client. Although such cases are rare, disbarment is warranted when there is such an intentional abuse of the lawyer-client relationship." The hearing panel found Mr. Manookian's use of the information about the prior lawsuit created the potential for serious injury to his former client.

Under both of the ABA Standards the hearing panel considered applicable, disbarment is the baseline sanction. Mr. Manookian does not challenge the hearing panel's determination that the presumptive sanction is disbarment. We agree these ABA Standards are applicable and disbarment is the correct presumptive sanction.

## B. Aggravating and Mitigating Factors

"Next, aggravating and mitigating factors are considered to determine whether the presumptive sanction should be increased or decreased." *In re Sitton*, 618 S.W.3d at 302 (quoting *Green*, 567 S.W.3d at 715). Aggravating circumstances are "any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21 (Definition of Aggravation).[88] Mitigating circumstances are "any

---

[88] Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

considerations or factors that may justify a reduction in the degree of discipline to be imposed."  ABA Standard 9.31 (Definition of Mitigation).[89]

---

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution;

(k) illegal conduct, including that involving the use of controlled substances.

ABA Standard 9.22.

[89] Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse . . . . . . .
(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

ABA Standard 9.32.

The hearing panel found four aggravating factors: (1) substantial experience; (2) prior discipline; (3) multiple offenses; and (4) refusal to acknowledge wrongful nature of conduct. It observed first that Mr. Manookian has substantial experience in the practice of law; he has been licensed to practice law in Tennessee since 2007. *See* ABA Standard 9.22(i).

The hearing panel noted that Mr. Manookian has a prior history of discipline; a private informal admonition in 2014 for conduct relating to his divorce that violated RPC 4.2, and a private reprimand in 2015 after Mr. Manookian was convicted of a misdemeanor, in violation of RPC 8.4(d). It also pointed out that this Court found on more than one occasion that Mr. Manookian posed a threat of substantial harm to the public and that he remained under temporary suspension; some of the misconduct underlying the suspensions related to *Shao* and some did not. *See* ABA Standard 9.22(a). We agree these are aggravating circumstances that point to an increase in discipline.

As a further aggravating factor, the hearing panel placed significant emphasis on Mr. Manookian's multiple offenses. *See* ABA Standard 9.22(d). The hearing panel commented, "Mr. Manookian has displayed a custom and habit of sending abusive, threatening, demeaning, embarrassing communications to opposing counsel and third parties for no reasonably legitimate purpose other than to embarrass or intimidate persons involved in litigation with Mr. Manookian."

We agree that the multiple offenses in this case are an aggravating circumstance. This is particularly so because of the nature of Mr. Manookian's offenses. Instead of plumbing the facts and law related to *Shao* in order to prevail for his client, Mr. Manookian used the most personal information he could find about opposing counsel and their families, to intimidate opposing counsel into standing down rather than risk personal mortification for themselves or their families. First, he used personal information he gained about Mr. Gideon and his family in his prior employment with Mr. Gideon's firm, even going so far as to use information he gained in a lawyer-client relationship in order to get at Mr. Gideon through his son. Not having the same level of inside knowledge about Mr. North, Mr. Manookian used Mr. North's brother against him, used information he obtained from having been schoolmates with Mr. North's children, and ultimately resorted to using intrusive private-investigator level tools to extract detailed personal information from routine litigation electronic communications with Mr. North. Mr. Manookian's multiple offenses are indeed an aggravating circumstance.

As yet another aggravating factor, the hearing panel found that Mr. Manookian refused to acknowledge the wrongful nature of his conduct. *See* ABA Standard 9.22(g). The hearing panel observed: "Mr. Manookian has never acknowledged that his conduct in this matter was unethical. Instead, he asserts that the Supreme Court cannot sanction him

- 71 -

for his conduct in this disciplinary action." This is also shown by his continuation of similar misconduct; the hearing panel observed that, "despite multiple warnings, punishment and opportunities for redemption, Mr. Manookian fails to learn and continues his horrific conduct."

Mr. Manookian's brief to this Court supports the hearing panel's finding. To be sure, on a couple of occasions in his testimony to the hearing panel, Mr. Manookian included pro forma expressions of regret, but they were interwoven with an expressed view of himself as the real victim, as when he testified that he should not have allowed himself to be "goaded" into sending one of his offending emails to Mr. North. We have noted: "Remorse in this context means more than mere regret at having engaged in conduct that resulted in disastrous consequences to the offending attorney. It must include taking responsibility by appreciating and acknowledging the seriousness of the attorney's misconduct." *In re Sitton*, 618 S.W.3d at 303. In his brief to this Court, Mr. Manookian continues to minimize his misconduct by pointing to the facial purpose of his emails and pleadings. For example, he maintains that the hearing panel failed to appreciate that his email to Mr. North with electronically extracted personal information about Mr. North's computer, his home address, his residential history, and his wife's vehicle, was merely to show that Mr. Manookian could prove Mr. North "had been receiving and opening his emails but was not replying to them." The hearing panel had ample reason to reject such sophistry. Mr. Manookian's continuing "claim [that] this is all just a gross misunderstanding . . . is not taking responsibility." *Id.* Thus, the hearing panel properly found that Mr. Manookian's refusal to acknowledge the wrongful nature of his conduct was a fourth aggravating circumstance that justifies an increase in discipline.

Mr. Manookian does not dispute the existence of these four aggravating factors. He does, however, disagree with the hearing panel's finding that there were no mitigating circumstances. Mr. Manookian contends that the hearing panel was obliged to consider the "imposition of other penalties or sanctions" as a mitigating factor under ABA Standard 9.32(k).[90] He maintains that the hearing panel should have credited him for previous time suspended for the same offenses because he has been temporarily suspended for several years, based at least in part on the allegations in this appeal.

The trial court considered and rejected this same argument, pointing out that none of the prior sanctions had deterred Mr. Manookian from further misconduct. It noted that, when this Court briefly reinstated Mr. Manookian's license after the first temporary suspension, further violations quickly resulted in reinstatement of the suspension. The trial

---

[90] ABA Standard 9.32(k) states that "imposition of other penalties or sanctions" may be considered a mitigating factor. ABA Standard 9.32(k). *See Lockett v. Bd. of Pro. Resp.*, 380 S.W.3d 19, 24 (Tenn. 2012).

court observed, "To borrow an old adage, Mr. Manookian is the author of his own misfortune, and is not entitled to credit because of the prior sanctions imposed upon him."

We agree. Under ABA Standard 9.32(k), the hearing panel was permitted to consider the other penalties and sanctions levied against Mr. Manookian as a mitigating factor. ABA Standard 9.32(k). However, it was not obligated to do so. We agree with the trial court that, given Mr. Manookian's consistent pattern of misconduct, the hearing panel did not err in declining to consider the other penalties and sanctions he had garnered as a factor to mitigate his sanction. The hearing panel's decision not to consider this a mitigating factor was neither arbitrary nor capricious under the circumstances of this case.

## C. Sanction

Having considered the aggravating and mitigating factors, we now review the sanction in light of all of the circumstances. *Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Barry*, 545 S.W.3d 408, 424–25 (Tenn. 2018).

For the sake of uniformity, we seek to review the sanctions imposed in any other cases with similar circumstances. *Allison*, 284 S.W.3d at 327.

Mr. Manookian cites multiple cases in support of his contention that the sanction imposed by the hearing panel is more punitive than the sanction received by others similarly situated and that he should have received a shorter suspension or concurrent suspensions. The cases he cites include *Beard v. Board of Professional Responsibility*, 288 S.W.3d 838, 859 (Tenn. 2009) and *Sneed v. Board of Professional Responsibility*, 37 S.W.3d 886, 891 (Tenn. 2000), *amended in part on reh'g*, (Jan. 3, 2001). But both *Beard* and *Sneed* are inapposite. Neither involves misconduct consisting of victimizing opposing counsel and their families, and for both the presumptive sanction under the ABA Standards was suspension, not disbarment.[91] *Beard*, 288 S.W.3d at 851; *Sneed*, 37 S.W.3d at 890–91. None of the cases cited by Mr. Manookian are similar in conduct, and none involve a sanction of suspension after a finding that the presumptive sanction was disbarment with

---

[91] In further support of his argument that any suspensions imposed on him should have run concurrently, Mr. Manookian cites *In re Delate*, 598 A.2d 154, 161 (D.C. 1991) ("When violations committed by a single attorney result in multiple disciplinary proceedings, sanctions imposed as a result of each proceeding should run concurrently if the violations occurred within the same general time frame."). *Delate* does not support Mr. Manookian's overall argument; the D.C. court in that case affirmed consecutive suspensions because the misconduct occurred over the course of several years. *Id.* The same is true of Mr. Manookian. The first temporary suspension imposed by this Court, from September 2018 to May 2019, was based on misconduct that occurred over several years. The second temporary suspension imposed by this Court, beginning in October 2019, was based on entirely new misconduct.

four aggravating and no mitigating factors. Mr. Manookian cites no comparable case showing that the sanction imposed by the hearing panel is too harsh.

The Board's brief to this Court cites no similar Tennessee cases to compare for uniformity of punishment. We likewise have found none that readily compare to this case.

Regardless of comparative cases, however, the primary tool for determining "appropriate and consistent sanctions for attorney misconduct" is the ABA Standards. *Thompson v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 600 S.W.3d 317, 320 (Tenn. 2020) (quoting *Bd. of Pro. Resp. of Sup. Ct. of Tenn. v. Daniel*, 549 S.W.3d 90, 100 (Tenn. 2018)). The Standards themselves state their purpose:

> The Standards constitute a model, setting forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct. They are designed to promote: (1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; (3) consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions.

ABA Standard 1.3 ("Purpose of These Standards"). Thus, the ABA Standards were "designed to promote . . . consistency in the imposition of disciplinary sanctions." *Barry*, 545 S.W.3d at 421 (quoting ABA Standard 1.3). "Use of the ABA Standards will further the goal of our disciplinary system because they 'combine clear, straight-forward guidelines which ensure a level of consistency necessary for fairness to the public and the legal system with the flexibility and creativity essential to secure justice to the disciplined lawyer." *Grievance Adm'r v. Lopatin*, 612 N.W.2d 120, 127 (Mich. 2000) (quoting *In re Buckalew*, 731 P.2d 48, 52 (Alaska 1986)). They serve as a guide to impose "a level of discipline that takes into account the unique circumstances of the individual case, but still falls within broad constraints designed to ensure consistency." *Id.*

Under the ABA Standards, barring unusual circumstances,[92] once the correct presumptive sanction is determined, that sanction generally applies unless "aggravating or mitigating factors . . . indicate a greater or lesser sanction is appropriate." *In re Sitton*, 618 S.W.3d at 299. Here, we have already determined that the correct presumptive sanction is disbarment. And the record supports the hearing panel's finding of four significant

---

[92] For example, the Court has on occasion departed from the presumptive sanction, even with aggravating circumstances and no mitigating circumstances, after its review of comparative cases. *See, e.g.*, *Beier v. Bd. of Pro. Resp. of Sup. Ct. of Tenn.*, 610 S.W.3d 425 (Tenn. 2020) (imposing suspension instead of the presumptive sanction of disbarment).

aggravating circumstances that "may justify an increase in the degree of discipline to be imposed." *Lockett v. Bd. of Pro. Resp.*, 380 S.W.3d 19, 28 (Tenn. 2012) (quoting ABA Standard 9.21). Because disbarment is the most severe attorney discipline that can be imposed, the discipline cannot be increased, but the presence of four aggravating factors militates against imposing a lesser sanction.

In some cases, the presumptive sanction and even aggravating factors can be offset by mitigating circumstances, that is, "considerations or factors that may justify a reduction in the degree of discipline to be imposed." *Id.* (quoting ABA Standard 9.22). Here, however, the hearing panel found none, and we have determined that this finding was neither arbitrary nor capricious.

Under the ABA Standards, then, all signs point to disbarment of Mr. Manookian. Despite this, the hearing panel deviated downward from the presumptive sanction of disbarment and instead imposed a sanction of a two-year active suspension, consecutive to the suspension already in place, plus twelve hours of anger management as a condition of reinstatement. The hearing panel offered no explanation for its decision.

On appeal from the hearing panel's decision, the trial court commented that the sanction imposed by the hearing panel was "significantly less than what it should have been" and agreed with the Board that the hearing panel's downward deviation from the presumptive sanction of disbarment was arbitrary and capricious under the circumstances. Had the Board filed its own petition for review, the trial court said, it "would have imposed a sanction of disbarment."

We agree with the trial court. This Court has said that "[a]n arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *City of Memphis v. Civ. Serv. Comm'n of City of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007) (brackets omitted) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)). The hearing panel offered no reasoning for its decision to impose suspension instead of the presumptive sanction, and its decision disregards the facts and circumstances of this case without any basis that would lead a reasonable person to do the same. Its decision can only be characterized as arbitrary and capricious.

As we consider the propriety of the sanction, several aspects of Mr. Manookian's misconduct deserve particular comment. First, to say that Mr. Manookian engaged in multiple offenses is to understate. Despite lectures, fines, sanctions, and suspensions from judge after judge, Mr. Manookian did not choose merely to continue engaging in misconduct—each time he received the expected negative reaction to his behavior, he

responded by *escalating* it.[93] At no point did Mr. Manookian cease of his own volition; he did not stop until he was *stopped*, by suspension of his law license.

Mr. Manookian engaged in this long pattern of intimidating and degrading conduct in order to succeed in *Shao* by coercing opposing counsel into standing down to avoid personal humiliation and emotional distress for them or their families. A business model of sorts, based on fear. *In re Sitton*, 618 S.W.3d at 307 (describing lawyer's pattern of misconduct as essentially cultivating "a business model as a 'liar for hire'") (quoting *Matter of Edson*, 530 A.2d 1246, 1249 (N.J. 1987)).

The length to which Mr. Manookian went to obtain detailed private information about opposing counsel also warrants comment. Mr. Manookian explained he used tracking applications imbedded into routine litigation email to give him detailed personal information about each person who opened the email, followed by a second service used by private investigators to obtain an even greater level of private information. Mr. Manookian's matter-of-fact testimony almost made it sound as though using private-investigator-level intrusive tools on everyday litigation correspondence to secretly extract private information to weaponize against opposing counsel is normal business behavior for a lawyer. It is not.

Most important, victimizing the *families* of opposing counsel and causing well-founded concern for their well-being and safety is an especially grave offense and a profound dishonor as a lawyer. Lawyers in litigation may be expected to assume the risk of a certain amount of rough-and-tumble. Their families do not. In preying on the families of opposing counsel, Mr. Manookian crossed the Rubicon.[94]

---

[93] As described previously, when facing a motion for sanctions for the email embarrassing Mr. Gideon's daughter, Mr. Manookian escalated by reproducing the offensive email in unredacted form, along with her name and the name of her employer, in a publicly filed pleading, and then doubled down by adding mischaracterized information about Mr. Gideon's son's lawsuit. Sanctioned by Judge Brothers for this misconduct, Mr. Manookian sought Judge Brothers's recusal. After Mr. North resisted those recusal efforts, Mr. Manookian sent Mr. North the "Good Friday" email insinuating a judge believed Mr. North to be dishonest. When he drew another sanctions motion for this, Mr. Manookian first publicized the offensive email by reproducing it in a publicly-filed complaint in another case, and then topped that off with another gratuitously insulting email to Mr. North. After yet another motion for sanctions was filed, Mr. Manookian cited Mr. North's brother in order to embarrass Mr. North, and then escalated further by sending Mr. North an ominous email containing detailed personal information about his home and family taken by intrusive means.

[94] "Rubicon" is "a stream in [northeast] Italy marking the ancient boundary between Italy and Cisalpine Gaul" crossed by Julius Caesar in 49 BC. *Rubicon*, *Shorter Oxford English Dictionary*, Vol 2 (Oxford Univ. Press 6th ed. 2007). "Crossing the Rubicon" signifies reaching "a point of no return." *Id.*

The subversive impact of Mr. Manookian's conduct on the justice system cannot be overstated. Were we to permit such conduct to go unchecked, lawyers would flee the profession rather than risk personal mortification or the welfare of their families. Our justice system depends on lawyers willing to participate as advocates within the bounds of our rules:

> The lawyer appearing as an advocate before a tribunal presents, as persuasively as he can, the facts and the law of the case as seen from the standpoint of his client's interest. It is essential that both the lawyer and the public understand clearly the nature of the role thus discharged. Such an understanding is required not only to appreciate the need for an adversary presentation of issues, but also in order to perceive truly the limits partisan advocacy must impose on itself if it is to remain wholesome and useful.

> In a very real sense it may be said that the integrity of the adjudicative process itself depends upon the participation of the advocate.

Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L. Rev. 353, 382 (1978).[95]

Finally, the record in this case offers no encouragement that Mr. Manookian would benefit from suspension and change his ways upon reinstatement. Apart from the misconduct in *Shao*, the record indicates Mr. Manookian drew findings by many judges that he engaged in fraudulent, threatening or demeaning conduct, or conduct that endangered the public or abused the judicial process. After the petitions for discipline in this case were filed, Mr. Manookian's temporary suspension was lifted only briefly before this Court, faced with findings by another hearing panel that Mr. Manookian had quickly resumed his intimidating conduct, reinstated the suspension.[96] The reinstated suspension

---

[95] Enforcement of boundaries on lawyers' conduct toward judges, lawyers, and all involved in litigation is in keeping with history and tradition dating back centuries. For example, in 1280, a London ordinance required legal advocates to take an oath, upon penalty of disbarment, which included "the duty to 'make proffers at the bar without baseness and without reproach and foul words and without slandering any man.'" Carol Rice Andrews, *The Lawyer's Oath: Both Ancient and Modern*, 22 Geo. J. Legal Ethics 3, 12 (2009) (citing Herman Cohen, *A History of the English Bar and Attornatus to 1450* 231–34 (1929), *reprinting Liber Custumarum.*

[96] As detailed above, the Court's order reinstating the temporary suspension recited that a second hearing panel found Mr. Manookian sent opposing counsel's client an email "designed to intimidate the client and undermine the client's relationship with the client's attorney," and then "intentionally sent another opposing counsel an email that contained a photograph of the opposing counsel's wife, personal information regarding his wife, and a photograph of opposing counsel's home, causing opposing counsel to be fearful for the safety of his family."

was based on a unanimous finding by the Court that Mr. Manookian constituted a threat of substantial harm to the public. Nothing in this record suggests that threat has abated.

The purpose of the attorney disciplinary process is to safeguard the administration of justice, protect the public from the misconduct or unfitness of members of the legal profession, and preserve the confidence of the public in the integrity and trustworthiness of lawyers in general. *See* ABA Standard 1.1. "Attorneys are trusted by the community with the care of their lives, liberty and property with no other security than personal honor and integrity." *Schoolfield v. Tenn. Bar Ass'n*, 353 S.W.2d 401, 404 (Tenn. 1961).

"[A] license to practice law in this state is not a right, but a privilege." *Barry*, 545 S.W.3d at 426 (citing *Sneed*, 301 S.W.3d at 618). "The license to practice law in this State is a continuing proclamation by the Supreme Court of the State of Tennessee . . . that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the Court." Tenn. Sup. Ct. R. 9, § 1. Mr. Manookian is no longer "fit to be entrusted" with a license to practice law in Tennessee.

This Court does not lightly impose on an attorney the sanction of disbarment. Here, it is clearly justified. We agree with the trial court that the suspension imposed by the hearing panel conflicts with its factual findings. Our role as guardians of the public trust requires us to impose disbarment.

We affirm the findings of the trial court as to the rule violations, reverse its decision as to the sanction, and order Mr. Manookian disbarred from the practice of law in Tennessee. Mr. Manookian's disbarment is effective upon entry of this Court's disbarment order. *See* Tenn. Sup. Ct. R. 9, § 28.1.

---

As noted above, these incidents are the subject of separate disciplinary proceedings, and Mr. Manookian's discipline in this case is based only on the misconduct found by the hearing panel in this case.

## CONCLUSION

For the reasons stated above, we affirm the trial court as to the rule violations and reverse as to the sanction. Mr. Manookian is hereby disbarred from the practice of law in the State of Tennessee, effective upon entry of this Court's order. *See* Tenn. Sup. Ct. R. 9, § 28.1. The costs of this appeal are taxed to Brian Philip Manookian and his surety, for which execution may issue if necessary.

_____
HOLLY KIRBY, CHIEF JUSTICE